**THYSSEN, INC., Plaintiff-Appellee,**

**v.**

**S.S. FORTUNE STAR, her engines, boiler, etc., Evolution Maritime Enterprises, Ltd., Defendants,**

**and**

**Taiwan International Lines, Ltd., Defendant-Appellant.**

**No. 85–7003.**

United States Court of Appeals, Second Circuit.

Argued Sept. 4, 1985.

Decided Nov. 8, 1985.

Vincent J. Barra, Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for defendant-appellant.

Joan S. Kingsley, Harold M. Kingsley, New York City, for plaintiff-appellee.

Before FRIENDLY, PIERCE and PRATT, Circuit Judges.

FRIENDLY, Circuit Judge:

This suit in admiralty in the District Court for the Southern District of New York was brought by Thyssen, Inc., the consignee of a shipment of 409 bundles of galvanized steel pipe, most of which were damaged while in transit between Pusan, Korea, and San Juan, Puerto Rico, against the S.S. Fortune Star; her owner, Evolution Maritime Enterprises, Inc.; and her time charterer, Taiwan International Lines, Ltd. (TIL). The ship and her owner were not served with process and did not appear, and the suit proceeded against the time charterer.[1] The steel pipe was shipped under clean bills of lading which were signed by agents of TIL in Pusan "for the master," an employee of the owner, and stamped "STOWED UNDER DECK." All the pipe was originally so stowed, but at some time before commencing the trans-Pacific crossing, pursuant to an order of some officer of the vessel, 290 bundles were placed on the deck where they were covered with canvas and plastic sheets. The Fortune Star encountered bad weather in crossing the Pacific, during which the coverings for the on-deck pipe, as well as the tarpaulins covering the wooden battens on the hatches above the under-deck pipe, were badly damaged and torn. On unloading at San Juan, substantial portions of the cargo, both that stowed on the deck and that stowed under the deck, were found to be damaged at least to some extent by oxidation which resulted from corrosion of the zinc coating after prolonged contact with sea water. The complaint alleged actual damages of $65,000; it also alleged that "[b]y reason of the intentional fraud and deviation of defendants plaintiff claims exemplary damages of $100,000."

TIL did not contest liability for compensatory damages either for the on-deck or the under-deck cargo but raised serious questions, hereafter discussed, about the adequacy of Thyssen's proof of the amount[2] and challenged the claim for punitive damages. The judge found that what he characterized as a joint survey in San Juan had established that the cargo had depreciated an average of 23% in value; that plaintiff had contracted to sell the shipment to a customer for $214,743.70 and "was therefore required to remit to the customer $49,391.05"; and that plaintiff had spent $3,989.15 in surveyor's fees to establish the damage. 596 F.Supp. 865, 866 (S.D.N.Y.1984). Accordingly, he

---

1. After judgment was entered against the time charterer, the action against the ship and her owner was voluntarily dismissed.

2. Thyssen had been reimbursed by its cargo insurer, which the judge considered to be the real party in interest.

awarded compensatory damages of $53,-380.20 with interest from the date of the delivery of the pipe. *Id.* at 866–67. Finding that the removal of part of the cargo from below the deck to deck stowage was an unreasonable deviation, *see Jones v. The Flying Clipper*, 116 F.Supp. 386 (S.D.N.Y. 1953), and was "a wilful act in derogation of [TIL's] obligation to the shipper which had specifically contracted to minimize the risk of damage to its shipment," he regarded it as "inappropriate to award merely contract damages where the conduct of the vessel indeed worked a fraud upon the owner of the cargo," citing *The Idefjord*, 114 F.2d 262, 266 (2 Cir.), *cert. denied*, 311 U.S. 707, 61 S.Ct. 175, 85 L.Ed. 459 (1940), and awarded punitive damages of $25,000. 596 F.Supp. at 866–67. TIL contends on appeal that plaintiff's evidence did not support the amount awarded as compensatory damages and that the award of punitive damages was erroneous as a matter of law.

## DISCUSSION

### I. *Compensatory Damages*

■ The judge was mistaken in characterizing the survey as having been a joint survey in the sense that TIL could be legally bound by it, *see Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp.*, 316 F.2d 163, 170–71 (5 Cir.1963); indeed, he had pointed out at the trial, some 20 months before the opinion was issued, that the survey "is not joint in the legal sense." Nevertheless, in light of all the evidence presented at trial, this misconception did not render clearly erroneous the judge's reliance on the results of the survey in determining the amount of compensatory damages.

After they had been notified of the damage to the cargo, Thyssen's cargo underwriters had arranged for a survey to be made at San Juan by a Captain Klotzek on November 5, 1979, 24 days after the arrival of the shipment. The survey was also attended by a Mr. Catanzaro, representing the steamship owner; a Mr. Casola, representing Thyssen Steel Caribbean, Inc., the party purchasing the pipe from Thyssen,

Inc., and thus the ultimate consignee of the pipe; and a Mr. Pietri, another surveyor employed by Thyssen Steel Caribbean. No one represented TIL, which had no agent at San Juan, although it appears to have been timely notified of the claim for damage to the cargo and to have had the opportunity to participate in the survey, but simply chose to rely on the carrier to represent its interests. The survey report made by Captain Klotzek recites difficulties which the surveyors encountered. Only 340 of the 409 bundles could be identified, the others apparently having been sold. Some of the bundles had been exposed to the elements after unloading. Captain Klotzek found definite evidence of corrosion due to the entrance of sea water but refrained from taking samples both because of the exposure to precipitation and because samples had already been taken by Mr. Pietri in the course of a preliminary survey made for Thyssen Steel Caribbean on October 15, 1979.

■ The survey report states that "[i]t was agreed by all parties concerned to have final consignee's retain the shipments at a depreciation allowance representing the best possible means in minimizing the final extent of loss." The report explained that cleaning and regalvanization were not possible in Puerto Rico and that to have this done on the mainland would be prohibitively expensive. It stated also that a salvage disposition, without taking into consideration possible segregation charges, would not have exceeded a 50% return. The surveyor estimated that a damage allowance of 17% to 20% would be realistic, and that "[i]n further negotiations with Thyssen Steel Caribbean, in the presence of the Steamship surveyor it was also considered that time and labor was necessary to sort out unuseable [sic] materials and a final depreciation of 23% was arrived at." The report added that "[w]hile the Steamship surveyor pointed out that he was not authorized to agree on any extent of loss consideration, it was our understanding that he considered the result of the negotiation, namely 23% depreciation overall as

fair and reasonable." This prediction proved to be accurate. Catanzaro's own survey report concluded that "the recommended allowance is fair and reasonable, taking into consideration the heavy oxidized pipes stowed on deck and the ones under deck with light damages." Although Catanzaro's report is not legally binding on TIL, it is entitled to evidentiary weight since his client also could have been held liable for the loss. *Cf. Shephard S.S. Co. v. United States,* 111 F.2d 110, 113 (2 Cir.1940) (lack of notice and absence of party at damage survey "are only important as they serve as guides to decision as to the weight to be given the evidence relating to the facts in issue").[3]

At trial, there was testimony by a Mr. Drobny, Thyssen, Inc.'s manager of insurance and claims, that the amount of the loss arrived at in the survey was refunded to Thyssen Steel Caribbean (which had already paid Thyssen, Inc. the full invoice price for the pipe), and copies of the refund checks were introduced into evidence. Although defendant's counsel stated at argument that Thyssen Steel Caribbean was an affiliate of the plaintiff and this was not denied by plaintiff's counsel, the record is that neither company owned stock in the other. The record also contains a deposition by Casola, an official of Thyssen Steel Caribbean, Inc. He stated that "once the allowance was reached, we passed that same allowance to the client that was received of the cargo," and that "[o]nce that material has arrived, everybody knows that Thyssen Steel has damaged pipe and therefore, they expect that allowance." Casola produced invoices showing that the allowance had been passed on to Thyssen Steel Caribbean's ultimate customers for most of the pipe, but was unable to produce such invoices with respect to 49 of the 409 bundles. He stated that these bundles, not having been sold upon arrival, "went into

inventory." No evidence as to the ultimate sale price of these bundles was ever introduced.

TIL's objection to the award of compensatory damages rests primarily on *Weirton Steel Co. v. Isbrandtsen-Moller Co.,* 126 F.2d 593 (2 Cir.1942); it reads Judge L. Hand's opinion as saying that a recovery for damage to cargo purchased for resale must be supported by evidence of the difference between what was realized on the resale to the ultimate consumer and what would have been realized if the damage had not occurred. If the transaction between Thyssen, Inc. and Thyssen Steel Caribbean was not at arm's length, the record here with respect to resale price, at least with respect to the 49 bundles for which there were no invoices or other showing that the discount was passed on to the ultimate consumer, might not be sufficient to support the award. However, TIL reads Judge Hand's opinion as saying more than it did. In *Weirton* the goods—tin plate destined to be converted in Hong Kong into five gallon oil cans to fuel the lamps of China—had been reconditioned at small expense and made into oil cans and there was simply no evidence that the oil in cans made from reconditioned plate sold at a lower price than oil in cans made from undamaged plate. Under these circumstances this court awarded only the costs of reconditioning. Judge Hand recognized that "[t]he ordinary rule is indeed that damages for injury to goods while in possession of a carrier are to be computed at the difference between the sound market value at destination and the value as damaged," adding, "That is obviously the right measure where the consignee buys the goods for resale which is the ordinary case." 126 F.2d at 594 (citations omitted). In *Weirton,* however, the court was dealing with a case where the goods were intended for manufacture by the shipper-

---

**3.** Defendant sought to respond to the argument that Mr. Catanzaro was, by representing the vessel owner, representing TIL's interests as well, by showing that he had also been hired to perform surveys for Thyssen Steel Caribbean in the past. This was simply a result of the fact

that Mr. Catanzaro held out his services as a surveyor to carriers and cargo owners generally, and his past relationships with Thyssen Steel Caribbean do not appear to have been such as to create any significant conflict of interest.

consignee, not for immediate resale, and the goods had been reconditioned at roughly one-tenth of the amount awarded by the district court. Moreover, the only evidence offered by the plaintiff in support of the higher measure of damages was its surveyor's testimony concerning what price the plate would bring if it was sold as plate, without reconditioning. In order to avoid a windfall to the plaintiff, the court thus demanded evidence that the product manufactured from the reconditioned plate had in fact sold for less than goods manufactured from undamaged plate. By contrast, the steel here was resold as such, reconditioning was impracticable, and there is evidence both as to the amount for which the steel was resold by Thyssen, Inc., and as to the amount for which a substantial portion of the steel was resold by Thyssen Steel Caribbean. We thus cannot say the evidence was so deficient that the amount of the award of compensatory damages was clearly erroneous.

## II. *Punitive Damages*

■ The district court cited no case in which an admiralty court has awarded punitive damages for a deviation or other breach of contract. Appellee cites none, and our research has located none.[4]

Appellee gains nothing from its citation of *In re Marine Sulphur Queen*, 460 F.2d 89, 105 (2 Cir.), *cert. denied*, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972), and *In re Complaint of Merry Shipping, Inc.*, 650 F.2d 622, 624–27 (5 Cir.1981). While these cases recognized that punitive damages may be awarded under general maritime law, both involved tort actions for wrongful death. Writing for this court in *Marine Sulphur Queen*, Judge Anderson cited two cases, *The Amiable Nancy*, 16 U.S. (3 Wheat.) 546, 4 L.Ed. 456 (1818), a maritime trespass suit, and *Precision Plating & Metal Finishing, Inc. v. Martin-Marietta Corp.*, 435 F.2d 1262 (5 Cir.1970), *cert. denied*, 404 U.S. 1002, 92 S.Ct. 571, 30 L.Ed.2d 556 (1971), apparently a diversity case, where the complaint clearly sounded in tort. Of the many cases cited in *Merry Shipping* as permitting the award of punitive damages in admiralty, none related to breach of contract.[5] Indeed, the only admiralty case cited that was not a typical tort case was *Robinson v. Pocahontas, Inc.*, 477 F.2d 1048 (1 Cir.1973). Although this upheld an award of punitive damages for a shipowner's wilful and callous withholding of a seaman's maintenance and cure, the court emphasized, *id.* at 1051–52, the Supreme Court's statement in *Vaughan v. Atkinson*, 369 U.S. 527, 532, 82 S.Ct. 997, 1000, 8 L.Ed.2d 88 (1962), that "[m]aintenance and cure differs from rights normally classified as contractual."[6]

Appellee likewise derives no benefit from statements, such as that in *Marine Sulphur Queen, supra*, 460 F.2d at 105, that "the award of punitive damages is discretionary with the trial court." This means only that even when the elements of a case for punitive damages have been established, the trial court is not bound to award them—not that a court may award punitive

---

**4.** Our recent decision in *Seguros Banvenez, S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 861 (2 Cir.1985), affirmed the dismissal of a request for punitive damages for a deviation on the sufficient bases of the district court's findings of lack of sufficient culpability and its discretion to deny punitive damages, *see infra*. The court did not advert to the question whether punitive damages could be awarded for a deviation when the necessary culpability existed.

**5.** The court did cite its decision in *Henderson v. U.S. Fidelity & Guaranty Co.*, 620 F.2d 530 (5 Cir.), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980), for the proposition that punitive damages "are available not only in suits based on negligence but also increasingly

in other types of cases, including those alleging breach of contract." 650 F.2d at 625 & n. 23. *Henderson*, however, which was a diversity case, dealt with what has been called "a new body of case law," commencing in the 1970's, "awarding punitive as well as compensatory damages against insurance companies on the basis of outrageous conduct in the handling of claims." *Prosser & Keeton on the Law of Torts* § 2, at 11 (5th ed. 1984).

**6.** In *Kraljic v. Berman Enterprises, Inc.*, 575 F.2d 412 (2 Cir.1978), also cited in *Merry Shipping*, 650 F.2d at 625 n. 18, this court declined to follow *Robinson* insofar as it allowed punitive damages exceeding attorneys' fees in a maintenance and cure action.

damages in a case where a settled rule of law prohibits such an award.

Appellee must thus overcome the principle, succinctly stated in *Restatement (Second) of Contracts* § 355 (1979):

> Punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable.

*See also* 11 *Williston on Contracts* § 1340, at 209–11 (W. Jaeger 3d ed. 1968); 5 *Corbin on Contracts* § 1077, at 438–39 (1964); Sullivan, *Punitive Damages in the Law of Contract*, 61 Minn.L.Rev. 207, 207 (1977). This rule applies although the breach is intentional or even when it has been effected with malicious intent. Simpson, *Punitive Damages for Breach of Contract*, 20 Ohio St. L.J. 284, 284 (1959); Farnsworth, *Contracts* § 12.8, at 842 (1982). Under Holmes' theory that a contract is simply a set of alternative promises either to perform or to pay damages for nonperformance, Holmes, *The Common Law* 235–36 (M. Howe ed. 1963), the rule would require no other explanation. Nevertheless, a good many have been offered. One is that the law of contracts governs primarily commercial relationships, where the amount required to compensate for loss is easily fixed, in contrast to the law of torts, which compensates for injury to personal interests that are more difficult to value, thus justifying noncompensatory recoveries. Sullivan, *supra*, at 222. Another, given by Corbin, *supra*, § 1077, at 438, is that breaches of contract do not cause the kind of "resentment or other mental and physical discomfort as do the wrongs called torts and crimes," and no retributive purpose would be served by punitive damages in contract cases. A third explanation, offered by economists, is the notion that breaches of contract that are in fact efficient and wealth-enhancing should be encouraged, and that such "efficient breaches" occur when the breaching party will still profit after compensating the other party for its "expectation interest." The addition of punitive damages to traditional contract remedies would prevent many such beneficial actions from being taken.

*See* Farnsworth, *supra*, § 12.3, at 817–18; *Restatement (Second) of Contracts* ch. 16 reporter's note. In any event the general rule is well established, although certain exceptions have been adopted.

The most common exception, which is specifically incorporated in the general rule in the *Restatement* and comprehends several other exceptions listed below, is where the breach constitutes an independent, wilful tort in addition to being a breach of contract, 5 Corbin, *supra*, § 1077, at 445; Farnsworth, *supra*, § 12.8, at 843. Others include breach of a contract to marry, Sullivan, *supra*, at 222–23; Corbin, *supra*, § 1077, at 440–43; failure of a public service company enjoying monopoly or quasi-monopoly power to discharge its obligations to the public, Sullivan, *supra*, at 223–26; Corbin, *supra*, § 1077, at 443–44; breach of a fiduciary duty, Sullivan, *supra*, at 226–29; breach of contract accompanied by fraudulent conduct (where, for example, the defendant conveys to a third party property given as security for the plaintiff's debt when the defendant has promised to reconvey the property to the plaintiff upon repayment of the debt), *id.* at 229–36; and the bad faith refusal by an insurer to settle an insurance claim for which it is liable, *id.* at 844; *see* note 5 *supra*. We thus reach the question whether deviation constitutes a tort or whether, if not, it should be regarded as coming within one of the recognized exceptions to the general rule against punitive damages in actions for breach of contract or as warranting us in creating another exception.

On its face a deviation, even in its original sense of a departure from the agreed course of the voyage, seems, as between the shipper and the carrier, to be "no more than a breach of the contract of carriage," although it has "always been treated as ipso facto a more serious breach than if it had occurred on land." *Farr v. Hain S.S. Co.*, 121 F.2d 940, 944 (2 Cir. 1941) (L. Hand, J.). A great admiralty judge, later to become a member of this

court, called deviation "a term of art, belonging in the main to the law of marine insurance, and to be interpreted by that law." *The Citta di Messina*, 169 F. 472, 474 (S.D.N.Y.1909) (Hough, J.). Generally an inexcusable deviation voided the insurance on the cargo, not only during the deviation but even after the vessel had returned to its course. *See* Gilmore & Black, *The Law of Admiralty* § 2–6, at 66–67 (2d ed. 1975). To aid cargo in meeting this problem, admiralty courts developed the principle that an unreasonable deviation deprived the ship of the benefit of limitations and exceptions in the bill of lading—this doctrine resting on the theoretical justification that a deviation amounts to a breach of warranty or condition precedent which, as in the case of the insurance contract, "goes to the root of the contract" of carriage and displaces at least some of its terms. *Joseph Thorley, Ltd. v. Orchis S.S. Co.*, [1907] 1 K.B. 667–68 (C.A.); *S.S. Willdomino v. Citro Chemical Co.*, 272 U.S. 718, 725, 47 S.Ct. 261, 261, 71 L.Ed. 491 (1927). *St. John's N.F. Shipping Corp. v. S.A. Companhia Geral Commercial*, 263 U.S. 119, 124–25, 44 S.Ct. 30, 30–31, 68 L.Ed. 201 (1923), extended the concept of deviation to include unauthorized on-deck stowage, holding that

> [b]y stowing the goods on deck the vessel broke her contract, exposed them to greater risk than had been agreed, and thereby directly caused the loss. She accordingly became liable as for a deviation, cannot escape by reason of the relieving clauses inserted in the bill of lading for her benefit, and must account for the value at destination.[7]

*See also The Sarnia*, 278 F. 459 (2 Cir. 1921). After adoption of the English Carriage of Goods by Sea Act, 1924, 14 & 15 Geo. 5, ch. 22, the House of Lords held that the principle laid down in *Thorley* remained intact despite the fact that article IV of the English statute, like § 4 of the United States Carriage of Goods by Sea Act of 1936 (COGSA), 46 U.S.C. § 1304, contained limitations on the types of losses for which the carrier could be held liable. *See Stag Line, Ltd. v. Foscolo, Mango & Co.*, [1932] A.C. 328 (1931). The same result was reached by Judge Weinfeld in *Jones v. The Flying Clipper*, 116 F.Supp. 386 (S.D.N.Y. 1953), a case of unauthorized on-deck stowage, with respect to § 4(5) of COGSA, which provides that neither the carrier nor the ship "shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package," unless the shipper had declared the nature and value of the goods or an agreement establishing a different maximum liability had been made, and we approved this in *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7, 18 (2 Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). *See* the discussion in *Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhaeuser*, 507 F.2d 68, 70–71 (2 Cir.1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975). Nothing in this history suggests that deviation is anything more than an intentional breach of contract, although, because of its "fundamental" character, *see Jones v. The Flying Clipper, supra*, 116 F.Supp. at 390, it entails consequences for the carrier which most breaches of contractual duty by a carrier by sea do not.

There have, however, been some references to a deviation as constituting a tort. One is in *Sidney Blumenthal & Co. v. United States*, 21 F.2d 798 (S.D.N.Y.1927), *rev'd on other grounds*, 30 F.2d 247 (2 Cir.), *cert. denied*, 279 U.S. 847, 49 S.Ct. 345, 73 L.Ed. 991 (1929), where Judge Hutcheson wrote, with customary vigor:

> Deviation is deviation, and its effect whenever it occurs, is the same; this effect is to abrogate the contract, and give the shipper an action for conversion.

Four of the five cases cited by him had not spoken of conversion; they held merely that the deviation deprived the carrier of certain exceptions and limitations in the bill

---

**7.** Considerable difficulty might have been avoided if later courts had continued to use Justice McReynolds' phrase "as for a deviation" rather than calling on-deck stowage a deviation.

of lading, and rendered it liable as an insurer. While in the fifth case, *Niles-Bement-Pond Co. v. Dampkiesaktieselskabet Balto,* 282 F. 235, 237 (2 Cir.1922), this court stated that "a failure to carry as required by the terms of the bill of lading or a deviation of the voyage gives the shipper the right to consider the goods *as converted by* the deviator" (emphasis added), *see also The Citta di Messina, supra,* 169 F. at 475, this statement did not address the underlying legal theory of liability but rather described the nature of the liability that would attach. Although the cases cited by Judge Hutcheson may have imposed the same measure of liability for a deviation as for conversion, they did not equate deviation with conversion. In *Farr v. Hain S.S. Co., supra,* 121 F.2d at 944, in discussing the deviation doctrine and stressing its essentially contractual nature, Judge Learned Hand cited *Sidney Blumenthal* and *The Citta di Messina* as examples of cases in which "it has even been said that the [deviating] shipowner converts the cargo," but then cautioned that "we should hesitate to press the consequences so far." *Contrast Allied Chemical International Corp. v. Companhia de Navegacao Lloyd Brasileiro,* 775 F.2d 476 (2 Cir.1985) (carrier held liable as a converter for causing delivery of goods to consignee without requiring presentation of bill of lading, as required by the contract of carriage).

The district judge relied also on language in *The Idefjord,* 114 F.2d 262, 266 (2 Cir.), *cert. denied,* 311 U.S. 707, 61 S.Ct. 175, 85 L.Ed. 459 (1940). There, in holding a second carrier liable as for a deviation when it had carried on deck goods for which clean bills of lading had been issued by the first carrier and honored by London banks in making payment, Judge Clark said that the second carrier "allowed a fraud to be worked upon any one who might innocently pay value for the bills." The term "injury" would have done as well, and the case clearly lacked, as this one does, an element essential to fraud, namely, an intention not

to perform the promise when made.[8] We thus conclude that mere deviation, without more, remains in the realm of contract, not of tort.

Of the other recognized exceptions to the rule against the award of punitive damages in actions for breach of contract, the closest to our case is that for breach of duty by a public service company. As stated in 5 Corbin, *supra,* § 1077, at 443, "In these cases, the breach complained of is the breach of a duty that may be reasonably regarded either as assumed by contract or as one imposed by the law independently of contract." Although the Fortune Star was a common carrier, a freighter bears scant resemblance to the railroads and electric utilities that were the subject of the decisions that gave rise to this exception.

Moreover, most of the cases decided under this exception deal with conduct reflecting vindictiveness and individual humiliation. *See, e.g., Ft. Smith & Western Railroad v. Ford,* 34 Okla. 575, 126 P. 745 (1912) (train failed to make scheduled stop for which plaintiff had purchased ticket; conductor exhibited "neglect and indifference" to plaintiff's plight, and brakeman refused to go back to the station, stating, "To hell with the station. I've passed it, fall off!"); *Hutchinson v. Southern Railway,* 140 N.C. 123, 125–26, 52 S.E. 263, 264 (1905) (jury entitled to award punitive damages based on finding that defendant "maliciously or willfully, wantonly, and rudely mistreat[ed] and humiliate[d] the plaintiff while a passenger" on the train: "The authorities are plenary that the passenger is entitled to recover punitive damages for insult or mistreatment on the part of any employee of the common carrier."). This is not present in most cases of deviation and certainly is not shown here. In others, *e.g., G., C. & S.F. Railway v. Levy,* 59 Tex. 542 (1883) (failure to deliver a telegram containing death message), it would have been impossible to arrive at any accurate assessment of compensatory damages. Altogeth-

---

8. We note that in *Jones v. The Flying Clipper, supra,* 116 F.Supp. at 389 & n. 18, Judge Weinfeld disclaimed reliance on the "fraud" notion and on the "fraud" lanuage in *The Idefjord.*

er we see no reason to construct out of these old cases—many of them seeming to reflect a populist dislike of railroads and other utilities—an exception in the general maritime law sufficiently broad to include unauthorized on-deck stowage by a cargo vessel.

By the same token, we likewise perceive no sufficient basis for constructing a new exception to the rule against punitive damages in contract actions to include unreasonable deviation. A recent article has propounded a list of the factors that have been thought to justify punitive damages—punishing the defendant; deterring others; preserving the peace; inducing private law enforcement; compensating victims for otherwise uncompensable losses; and paying plaintiff's attorneys' fees. Ellis, *Fairness and Efficiency in the Law of Punitive Damages*, 56 S.Cal.L.Rev. 1, 3–12 (1982); *see also Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 838 (2 Cir. 1967). We need not engage in extended discussion to show that few of these factors apply to unauthorized on-deck stowage or—the real issue here—that they apply more significantly to it than to many other breaches of the contract of carriage, *e.g.*, the duty to furnish a seaworthy ship, which we have held not to constitute a deviation. *See Iligan, supra*, 507 F.2d at 72. In almost all cases of unreasonable deviation today cargo will long since have been fully compensated by its insurer, *see* Gilmore & Black, *supra*, § 2–6, at 66–67; Vogel, *The Hull Policy: The Perils and Held Covered Clauses*, 41 Tul.L.Rev. 259, 276 (1967). Although vessels might be able to insure against vicarious punitive damage liability, *see Northwestern National Casualty Co. v. McNulty*, 307 F.2d 432, 439–40 (5 Cir.1962) (Wisdom, J.); Ellis, *supra*, 56 S.Cal.L.Rev. at 71 & n. 307; *but cf. Hartford Accident & Indemnity Co. v. Village of Hempstead*, 48 N.Y.2d 218, 223, 397

N.E.2d 737, 740, 422 N.Y.S.2d 47, 50 (1979) (declining to decide question of insurability of vicarious punitive damage liability in context of suits under 42 U.S.C. § 1983), the expense of such insurance would be problematic and would impose added costs on all shippers in order to confer bonanzas on a few. Moreover, and most important, the greatest objective sought to be obtained by an award of punitive damages, to wit, deterrence, is already obtained in cases of deviation by the severe sanction of disallowing exceptions and limitations in the bill of lading, especially when this is carried to the point of making the carrier an insurer even with respect to losses having no causal relation to the deviation.[9]

We therefore decline to hold that deviation comes within a recognized exception to the rule against punitive damage for breach of contract, which is as much a part of the general maritime law as is the rule allowing such damages in actions for tort, or to create one for it.

An alternative ground for reversing the award of punitive damages in this case is the lack of evidence connecting the deviation with responsible officials of TIL. The nature of the culpability required for a punitive damage award in admiralty is a question of federal law. *See Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550 (1959). Until recently, we should have rather readily found the federal rule with respect to the liability of a corporation for punitive damages to be the strict "complicity rule" announced in *Lake Shore & M.S.R. Co. v. Prentice*, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893), a diversity case decided under the regime of *Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842). In *In re Marine Sulphur Queen, supra*, 460 F.2d at 105, we relied on *Lake Shore* for the proposition that punitive damages can properly be awarded

---

**9.** Whether the principle extends this far, as seems to have been assumed, is discussed but not decided in *Hellenic Lines, Ltd. v. United States*, 512 F.2d 1196, 1209 (2 Cir.1975) (citing cases); *Calmaquip Engineering West Hemisphere Corp. v. West Coast Carriers Ltd.*, 650 F.2d 633, 640–41 (5 Cir.1981); and *Mobil Sales & Supply Co. v. M.V. "Banglar Kakoli"*, 588 F.Supp. 1134, 1146–47 (S.D.N.Y.1984) (Weinfeld, J.). *See also*, arguing for the restricted view, Gilmore & Black, *supra*, § 3–41, at 180–82 & n. 124.

in admiralty only if the intent necessary to create liability for punitive damages "is brought home to the corporation," 147 U.S. at 111, 13 S.Ct. at 264, as by action or authorization by a high corporate officer or by ratification. *See also Morrissey v. National Maritime Union,* 544 F.2d 19, 25 (2 Cir.1976) (citing *Lake Shore* in holding that the complicity rule applies in determining a union's liability for punitive damages under the Landrum-Griffin Act). However, the Supreme Court, in a footnote, has now cast some doubt on the continued vitality of the rigors of the *Lake Shore* opinion. *See American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 575 n. 14, 102 S.Ct. 1935, 1947 n. 14, 72 L.Ed.2d 330 (1982).[10] In a recent admiralty case, *Protectus Alpha Navigation Co. v. North Pacific Grain Growers, Inc.,* 767 F.2d 1379, 1386–87 (9 Cir.1985), the Ninth Circuit has somewhat relaxed *Lake Shore* by adopting the standard of *Restatement (Second) of Torts* § 909 (1975), which included the case where an "agent was employed in a managerial capacity and was acting in the scope of employment," and held that, on the evidence there presented, a dock foreman was such an agent. The record is silent as to who shifted some of the bundles from below to above deck. Since such decisions are usually made by the master or the chief mate, plaintiff asks us to assume that this was the case here. However, even if we should make that assumption, should further assume that such officers would be "managerial agents" of the vessel, and should agree with the Ninth Circuit that § 909 of the *Restatement* rather than the *Lake Shore* decision affords the proper standard—a question to which

we would wish to devote further thought— plaintiff would face the further obstacle that here the master and the mate were employees of the owner and not of the charterer against which punitive damages have been awarded.

The question of the responsibility of the owner and time charterer for each other's acts rarely requires exploration in actions seeking compensatory damages for loss of or damage to cargo since generally both are liable. *See Fernandez v. Chios Shipping Co.,* 542 F.2d 145, 152 & n. 11 (2 Cir.1976); Bauer, *Responsibilities of Owners and Charterers to Third Parties— Consequences Under Time and Voyage Charters,* 49 Tul.L.Rev. 995, 997–1001 (1975). The issue has had to be explored in cases where one party who has been held liable to a shipper seeks indemnity from the other. On this we have said, citing many cases, that, as between the charterer and the shipowner, "In the carriage of goods under a time charter, absent any special provision or circumstance, the duty to load, stow, and discharge cargo—and the consequences for failing to do so properly—fall upon the ship and her owners." *Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 330 (2 Cir.1972). In practice, however, as shown by *Nichimen* itself, primary responsibility for damage to the cargo has been at least partially shifted by charter provisions, such as clause 8 of the charter form approved by the New York Produce Exchange, which specifies that "Charterers are to load, stow, and trim the cargo at their expense under the supervision of the Captain," *see* Gilmore & Black, *supra,* app. B. at 1005.[11] *See also Fernandez, supra,* 542 F.2d at 151–53 (clause 8 also sufficient

**10.** The footnote seems to have been quite unnecessary since the issue was not corporate liability for punitive damages but for the treble damages provided for private antitrust suits in 15 U.S.C. § 15, and, as the Court itself noted, 456 U.S. at 575–76, 102 S.Ct. at 1947–48 (citing the *Restatement (Second) of Agency* § 217C, comment c (1957)), rules limiting a principal's liability for punitive damages do not apply to specific statutes giving triple damages.

**11.** The presence of such a clause explains Judge Hough's statement in *The Santona,* 152 F.

516, 518 (S.D.N.Y.1907), quoted in *Yeramex International v. S.S. Tendo,* 595 F.2d 943, 946 (4 Cir.1979), and in Bauer, *supra,* 49 Tul.L.Rev. at 1004, that

[t]he ship is the owner's ship, and the master and crew his servants for all details of navigation and care of the vessel; but for all matters relating to the receipt and delivery of cargo, and to those earnings of the vessel which flow into the pockets of the charterers, the master and crew are the servants of the charterers.

to shift, as between time charterer and shipowner, primary responsibility for personal injury arising out of unloading operations, even though not caused by time charterer's own fault). Here the district court, in imposing punitive damages upon the time charterer, relied on the portion of our discussion in *Nichimen* relating to the effect of clause 8 in transferring the duty to stow the cargo to the time charterer. But the charter is not in the record and we do not know whether it contained such a clause or not. If not, it would seem clearly improper to award punitive damages against the time charterer for the owner's breach of duty. But even if it did, we have been cited to no authority departing so far from the complicity rule as to justify the imposition of punitive damages because of acts of employees of another, even if the employees were discharging a duty of the defendant and were acting in its financial interest but without direction from it. The deterring effect of punitive damages is severely diluted when the actors are employees not of the person held liable but of another whom he has hired to perform his tasks. And, as pointed out above, the argument for straining to award punitive damages is particularly weak in the case of deviation where heavy sanctions exist in any event.

In the light of these alternative grounds for reversing the award of punitive damages, we need not consider TIL's further argument that such an award is barred by the provision in the second paragraph of § 4(5) of COGSA, 46 U.S.C. § 1304(5), which, in permitting the carrier and the shipper to agree on maximum amounts of the carrier's liability greater than those previously specified, provides: "In no event shall the carrier be liable for more than the amount of damage actually sustained."

Insofar as the judgment awarded compensatory damages, it is affirmed; insofar as it awarded punitive damages, it is reversed. Appellant may recover two-thirds of its costs; appellee may recover one-third of its.