**THYSSEN, INC., and its Subrogated Underwriter La Fondiaria Assicurazioni S.p.A. (Successor to Italia Assicurazioni S.p.A.), Plaintiff–Appellee, Cross–Appellant,**

**Associated Metals & Minerals Corp., and its Subrogated Underwriter Naviga S.A. and Thyssen Stahlunion Gmbh, Plaintiff–Appellee,**

**v.**

**S/S EUROUNITY, now Seamusic II, her engines, boilers, tackle, etc.; Licetus Shipping, Inc., Defendants–Appellants, Cross–Appellees,**

**Atlantic Lines S.A., Defendant–Appellant, Cross–Appellee.**

**Nos. 828, 978, 979, Dockets 93–7682, 93–7708 and 93–7718.**

United States Court of Appeals, Second Circuit.

Argued Dec. 13, 1993.

Decided April 8, 1994.

Edward M. Cuddy, III (Michael O. Hardison, Poles, Tublin, Patestides & Stratakis, New York City, of counsel), for defendants-appellants-cross-appellees, S/S Eurounity and Licetus Shipping, Inc.

Alan Van Praag (Snow Becker Krauss P.C., New York City, of counsel), for defendant-appellant-cross-appellee, Atlantic Lines S.A.

Harold M. Kingsley (Kingsley & Kingsley, Hicksville, NY, of counsel), for plaintiff-appellee-cross-appellant.

Before: MINER and WALKER, Circuit Judges, and MUNSON, District Judge.*

MINER, Circuit Judge:

Defendants-appellants-cross-appellees S/S Eurounity ("Vessel"), Licetus Shipping, Inc. and Atlantic Lines S.A. appeal from a judgment entered on June 10, 1993 in the United States District Court for the Southern District of New York (Sand, *J.*) awarding damages in the amounts of $336,580.89 to plaintiff-appellee-cross-appellant Thyssen, Inc. and $19,447.55 to plaintiff-appellee Associated Metals & Minerals Corp. ("Associated") in an action brought pursuant to the Carriage of Goods by Sea Act, 46 U.S.C.App. §§ 1300–1315 ("COGSA"), for seawater damage to steel cargo. The district court found that (1) plaintiffs had stated a valid claim and had established that they were proper parties to

---

* Honorable Howard G. Munson of the United States District Court for the Northern District of New York, sitting by designation.

bring suit; (2) plaintiffs had established a *prima facie* case for cargo damage under COGSA by presenting evidence that the cargo was in good order at loading and damaged at outturn; (3) defendants had failed to prove that the seawater damage to the steel cargo was due to a "peril of the sea"; (4) seawater had entered the vessel through unseaworthy hatchcovers; (5) the "market discount" theory was the proper measure of damages; and (6) 46 U.S.C.App. § 1304(5) limited plaintiffs' damages to a maximum of $500 per package.

On this appeal, the Vessel and Licetus contend that plaintiffs failed to state a claim upon which relief can be granted and that the district court erred by finding that the plaintiffs had established a *prima facie* case for cargo damage under the provisions of COGSA. The Vessel and Licetus also contend that the district court erred in determining: that they failed to prove the defense of "peril of the sea"; that the hatchcovers were unseaworthy; and that the "market discount" theory applied to the calculation of damages in this case. Atlantic Lines cross-appeals from the judgment of the district court to the extent that the judge failed to resolve Atlantic Lines' indemnity claim for costs and attorneys' fees against the Vessel and Licetus. Thyssen cross-appeals, seeking modification of the judgment to allow it to collect its actual damages up to the COGSA package limitation from each defendant.

For the reasons that follow, the judgment of the district court is affirmed.

## BACKGROUND

Thyssen and Associated are importers of steel products. They purchased a quantity of hot rolled steel in Europe for the purpose of resale and made arrangements to ship the steel from Antwerp, Belgium to Charleston, Jacksonville, Savannah and Houston aboard the Vessel. Atlantic Lines, the charterer of the Vessel, issued negotiable bills of lading for the cargo. The bills of lading included notations indicating that the steel was "RUST STAINED," "PARTLY RUST STAINED" and "WET BEFORE SHIPMENT."

On or about December 6, 1988, prior to the loading of the cargo, Atlantic Lines had entered into a charter party with Licetus, the owner of the Vessel. Licetus warranted that the hull, machinery and equipment were in a "thoroughly efficient state" and that, on her delivery, the Vessel was "ready to receive . . . cargo with clean-swept holds and [was] tight, staunch, strong and in every way fitted for . . . service." Licetus additionally "guaranteed" the Vessel's hatch covers to be "completely watertight." The charter party also included the "Inter–Club Agreement," which provided that claims for cargo damage were to be settled as follows:

Claims for Loss of or damage to cargo due to unseaworthiness: 100% Owners

Claims for damage (including slackage/ullage) due to bad stowage or handling: 100% Charterers

During the transportation of the cargo, the Vessel encountered a severe storm on January 4, 1989. This storm was classified as an "ultra bomb" (extra-tropical cyclone) because its central pressure plummeted sixty millibars in twenty-four hours. The storm resulted in Beaufort Scale winds between Force 10 and 11,[1] waves between 10 and 11.5 meters in height and chaotic cross-seas. During the storm, the Vessel was hove to (ship's bow pointed into wind without forward motion) and its weatherdeck was awash. There is no dispute that seawater entered the cargo holds through the Vessel's cargo hatches during the storm. The Vessel's owner, Licetus, presented evidence and expert testimony to support its claim that the severe weather placed such torsional stress on the hull and hatches that seawater entry was inevitable. Thyssen, on the other hand, offered evidence and expert testimony that was intended to prove that the weather conditions did not cause the entry of the seawater. According to Thyssen, the cargo hatches and seals were not maintained properly and, as a result, were worn and unseaworthy, thereby allowing seawater to enter the cargo holds. Upon the Vessel's arrival at the designated ports, the cargo was sold to various purchasers. These purchasers demanded a discount in price due to the damaged condition of the

---

1. Winds of Beaufort Scale Force 12 are considered hurricane-strength winds.

steel caused by the seawater contamination that occurred during the voyage.

Plaintiffs' claims at trial, pursuant to COG-SA, "relate[d] to salt water damage to 104 coils of hot rolled steel." During the five-day bench trial, the following issues were raised: (1) whether the plaintiffs had standing to sue; (2) whether the plaintiffs had established a *prima facie* case for cargo damage by introducing clean bills of lading and proving the damaged condition of the cargo upon discharge; (3) whether the defendants were entitled to rely upon the statutory provision for exoneration because (a) the damage to the cargo was due to a "peril of the sea," (b) the Vessel was seaworthy, and (c) due diligence was exercised; and (4) whether the plaintiffs had shown an entitlement to damages and, if so, whether the proper method of computing damages was used.

At the conclusion of trial, the district court held that the plaintiffs had established that they were the proper parties to bring the suit and that they had proved a *prima facie* case by evidence that the cargo was in good order at loading but damaged at outturn. The district court further held that defendants had failed to prove that the damage to the cargo was due to a "peril of the sea"; that seawater had entered the Vessel through unseaworthy hatch covers; and that the "market discount" theory was the proper measure of damages. With regard to responsibility under the Inter–Club Agreement, the district court stated that "it seems clear that the vessel owner, who has warranted to the charterer the seaworthiness of the vessel, is the ultimately responsible party." The district court made no finding as to whether Atlantic Lines, the charterer, was entitled to indemnification for costs and attorneys' fees. The district court held that the defendants were jointly and severally liable to Thyssen and reduced Thyssen's damages from $329,330.65, to $500 per package, pursuant to 46 U.S.C.App. § 1304(5), and computed the damages as follows: Thyssen recovered $500 per package for 420 packages, equalling $210,000; $30,845 for 240

steel plates not shipped in packages; plus $95,735.89 in interest, for a total of $336,-580.89. Associated recovered $13,915.94 for 94 steel plates not in packages, plus $5531.61 in interest, for a total of $19,447.55. The total judgment of $356,028.44 was taxed against the Vessel *in rem* and Licetus and Atlantic Lines *in personam*.

## DISCUSSION

### 1. Proper Claim for Relief

■ Licetus first argues that Thyssen is not entitled to recover against it because Thyssen was indemnified for its loss by Thyssen Stahlunion Gmbh ("Stahlunion"), the supplier. The steel in this case was purchased by Thyssen from Stahlunion C.I.F. United States ports of destination, which obligated Stahlunion to purchase insurance on behalf of Thyssen. Following the discounted sale of the steel by Thyssen to the purchasers, Stahlunion paid Thyssen in full for its claimed losses. Stahlunion subsequently was indemnified by La Fondiaria Assicurazioni, its underwriter.[2] Licetus and the Vessel contend that they are only liable to Thyssen but, since Thyssen was paid by Stahlunion, Thyssen is not entitled to recover from them. We disagree.

The fact that Thyssen has received payment for the damage from another source does not mean that it cannot seek recovery from Licetus and the Vessel. In *Texport Oil Co. v. M/V Amolyntos,* 11 F.3d 361, 367 (2d Cir.1993), we recently held that the "collateral source" doctrine applies to COGSA actions and a tortfeasor is not entitled to use a plaintiff's settlement with collateral sources of payment to avoid liability for damages. Under this doctrine,

> [t]he question is not whether a windfall is to be conferred, but rather who shall receive the benefit of a windfall which already exists. As between the injured person and the tortfeasor, the former's claim is the better. This may permit a double recovery, but it does not impose a double

**2.** Prior to trial, Licetus and the Vessel raised a claim that there was no real party in interest since the only plaintiffs at that time were Thyssen and Associated Metals. This claim was resolved when the parties entered into a stipulation that added Stahlunion and La Fondiaria as parties to the action.

burden. The tortfeasor bears only the single burden for his wrong. *Gypsum Carrier, Inc. v. Handelsman,* 307 F.2d 525, 534 (9th Cir.1962); *see* Restatement (Second) of Torts § 920A(2) (1979).

Applying the collateral source doctrine to the facts of this case, it is apparent that Thyssen, rather than Licetus and the Vessel, is entitled to any "windfall" under the contracts it entered into and that it is entitled to recover from both the Vessel and Licetus. The Vessel and Licetus are liable only for the damage that they caused, and Thyssen is entitled to receive the benefit of its bargain with Stahlunion.

### 2. Liability

#### A. Prima Facie Case

 To establish a *prima facie* case for damages under COGSA, Thyssen must demonstrate that the steel was damaged while in the custody of the Vessel. *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 351–52 (2d Cir.1981); *In re Tecomar S.A.,* 765 F.Supp. 1150, 1173 (S.D.N.Y.1991). Thyssen can meet this burden by proving that it delivered the steel in good condition to the Vessel and that the steel was in a damaged condition at outturn. *See, e.g., Nissho–Iwai Co. v. M/T Stolt Lion,* 719 F.2d 34, 38 (2d Cir.1983); *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir.1982). Here, it is uncontroverted that seawater entered the holds of the Vessel during the voyage and that the steel arrived at the ports of destination in damaged condition. The only issue in dispute is whether Thyssen proved that the steel was delivered to the Vessel in good condition prior to the Vessel's departure from Antwerp.

 It is well settled that a clean bill of lading ordinarily is prima facie evidence of delivery in good condition. *See Spencer Kellogg, Div. of Textron, Inc. v. S.S. Mormacsea,* 703 F.2d 44, 46 (2d Cir.1983); *Caemint Food,* 647 F.2d at 352. Licetus and the Vessel contend, however, that the bills of lading here cannot support the plaintiffs' *prima facie* showing since they included the notations, "RUST STAINED," "PARTLY RUST STAINED" and "WET BEFORE SHIPMENT." They argue that these notations contradict the district court's finding that the steel was in good condition. We disagree.

There was ample evidence that the steel was in good condition when delivered. The deposition testimony of Captain Tijan, an Antwerp surveyor, and the trial testimony of Franz Ernst, a freight forwarder specializing in steel products at Antwerp for four years, which the district court found credible, demonstrated that the clauses on the bills of lading indicate steel of good condition. Ernst testified that the Port of Antwerp had used these standardized notations for approximately thirty years to refer to nondamaging, atmospheric rust that does not affect the value of steel. Tijan testified that steel is considered to be in "prime" condition when the bills of lading include these standardized notations. The record is devoid of any evidence that controverts Thyssen's claim that the notations on the bills of lading indicate anything other than the sound condition of the steel upon loading.[3] Since the bills of lading indicate that the steel was in good condition prior to the voyage, and it is uncontroverted that the steel was in a damaged condition at outturn, the plaintiffs have established their *prima facie* right to recover for damages. *See Couthino, Caro & Co. v. M/V Sava,* 849 F.2d 166, 168, 172 (5th Cir. 1988) (finding that steel was in good condition upon delivery to carrier was not precluded by exceptions noting rust in bills of lading for cold rolled steel).

#### B. Peril of the Sea

 Once the plaintiffs established a *prima facie* case, the burden shifted to Licetus and the Vessel to prove that they should not be held liable because the seawater damage was due to one of the causes set forth in 46 U.S.C.App. § 1304(2). *See, e.g., M. Golodetz Export Corp. v. S/S Lake Anja,* 751 F.2d 1103, 1110 (2d Cir.), *cert. denied,* 471 U.S.

---

**3.** Although it was not relied upon by the district court, a survey report of the steel loaded onto the Vessel, made prior to the Vessel's departure from Antwerp, stated: "Amount of depreciation caused by any rust condition observed: none."

1117, 105 S.Ct. 2361, 86 L.Ed.2d 261 (1985). Interposing the affirmative defense of peril of the sea, Licetus and the Vessel specifically contend that they are entitled to exoneration from liability pursuant to section 1304(2)(c). That section provides that "[n]either the carrier nor the ship shall be liable for loss or damage arising or resulting from ... [p]erils, dangers, and accidents of the sea or other navigable waters." 46 U.S.C.App. § 1304(2)(c).

A peril of the sea occurs when conditions " 'are of an extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence.' " *J. Gerber & Co. v. S.S. Sabine Howaldt,* 437 F.2d 580, 588 (2d Cir. 1971) (quoting *The Giulia,* 218 F. 744, 746 (2d Cir.1914)). The determination of whether given conditions constitute a peril of the sea is wholly dependent on the facts of each case and is not amenable to a general standard. *See Duche v. Thomas & John Brocklebank, Ltd.,* 40 F.2d 418, 420 (2d Cir.1930); *Kane Int'l Corp. v. MV Hellenic Wave,* 468 F.Supp. 1282, 1283 (S.D.N.Y.), *aff'd,* 614 F.2d 1287, 1288, 1290 (2d Cir.1979). Relevant factors that should guide a court's determination include wind strength, the nature and extent of damage to the ship and the extent of cross-seas. *Sabine Howaldt,* 437 F.2d at 596. Courts also must be cognizant that their ultimate conclusions should turn on whether the weather conditions were foreseeable, given the location and time of the year. *Id.; Tecomar, S.A.,* 765 F.Supp. at 1175. We review *de novo* the district court's conclusion that Licetus and the Vessel failed to prove that there was a peril of the sea. *See Sabine Howaldt,* 437 F.2d at 594; *R.T. Jones Lumber Co. v. Roen S.S. Co.,* 270 F.2d 456, 458 (2d Cir.1959).

The Vessel's peril of the sea defense is premised on the fact that the storm encountered on January 4, 1989 was unique because of the winds and cross-seas created by the rapid decrease in pressure incident to the storm. We cannot agree, however, that the weather conditions created by this storm constituted a peril of the sea. The Vessel's bridge log book, which the district court relied upon, recorded Beaufort Scale winds that did not exceed a level of 10–11 on January 4, 1989.[4] Expert testimony at trial indicated that there were significant wave heights of between 10 and 11.5 meters. We find nothing of an extraordinary nature, nor do we find irresistible force or overwhelming power in these conditions. Indeed, the testimony of the meteorological expert witnesses for both sides revealed that, for the most part, the weather conditions experienced by the Vessel were not unusual in the North Atlantic in the wintertime. *Cf. Tecomar S.A.,* 765 F.Supp. at 1176 (North Atlantic waters are widely regarded as a hostile environment during the winter months); *Kane Int'l Corp.,* 468 F.Supp. at 1285 (same). Dr. Austin Dooley, the defendants' expert, testified that Force 11 winds and significant wave heights of 10 to 11.5 meters were foreseeable. Similarly, the plaintiffs' expert, Robert Raguso, testified that the weather conditions encountered by the Vessel were foreseeable. Although the Vessel experienced strong cross-seas, perhaps stronger than usual, due to the decrease in pressure attributable to the ultra bomb of January 4, both experts indicated that cross-seas generally could have been expected.[5] Moreover, the district court also found that "the [V]essel took waves over the hatch covers throughout the voyage, suffered strong rolling and was hove to in the winds of only 6, 7, 8 and 9 of the Beaufort Scale." Given that severe storms occur on a regular basis in the North Atlantic and that the winds, waves and cross-seas experienced by the Vessel were to be expected, we conclude that the Vessel has not proven that it is entitled to exoneration based on a peril of the sea.

### 3. Damages

#### A. Measure of Damages

Licetus and the Vessel argue that, with regard to the Jacksonville and

---

4. The Beaufort Scale winds of 10–11 were listed only for one four-hour period. Otherwise, the log book indicates Beaufort Scale winds of Force 9 or 10 on January 4.

5. The district court also found that the Vessel "sustained some damage to deck equipment resulting from the intensity of the wind and the waves." However, this statement does not indicate that the damage was extraordinary.

Charleston cargo, the district court erred in calculating Thyssen's damages under the market discount theory instead of the remediation rule of *Weirton Steel Co. v. Isbrandtsen–Moller Co.*, 126 F.2d 593 (2d Cir.1942). We review the district court's choice of a measure of damages for abuse of discretion. *Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli*, 814 F.2d 115, 119 (2d Cir.1987).

▮▮▮ Under COGSA, a carrier is not liable for more than the amount of damage actually sustained. 46 U.S.C.App. § 1304(5); *see Internatio, Inc, v. M.S. Taimyr*, 602 F.2d 49, 50 (2d Cir.1979). "Generally, the measure of damages is the difference between the fair market value of the goods at their destination in the condition in which they should have arrived and the fair market value in the condition in which they actually did arrive." *Kanematsu–Gosho*, 814 F.2d at 118. Nevertheless, the market discount theory is not the exclusive measure of damages and need not be applied if "circumstances suggest a more appropriate alternative." *Texport Oil*, 11 F.3d at 365; *see Kanematsu–Gosho*, 814 F.2d at 118–19.

In applying an alternative measure of damages in *Weirton Steel*, this Court stated that the remediation costs incurred represented the proper measure of damages under the circumstances of that case. There, the shipper-consignee did not immediately resell the damaged cargo, consisting of tin plates, but instead reconditioned the tin plates and manufactured them into oil cans. The consignee then sold its oil in the reconditioned cans. However, in the subsequent action for damages, it never was clearly established whether the consignee sold oil in the reconditioned cans at a discount from oil sold in the tin cans that had not been damaged. In light of these facts, we held that only the costs of reconditioning were appropriate damages. 126 F.2d at 595; *see Texport Oil*, 11 F.3d at 365 (remediation measure of damages appropriate since owner sold gasoline cargo at full market price and cost incurred in blending gasoline to ameliorate damage was most accurate measure of damages).

In this case, however, there simply was no occasion for the district court to apply the measure of damages that we applied in *Weirton Steel* and *Texport Oil*. Thyssen did not recondition the steel and resell it at the market rate; instead, after its surveyors appraised the damaged cargo, Thyssen sold the steel to its Charleston and Jacksonville customers at a discount. Therefore, the market discount test clearly was the appropriate measure of damages. *See Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57, 61–62 (2d Cir.1985) (applying market discount measure of damages to resale of steel pipe by consignee at discount without reconditioning).

### B. COGSA Package Limitation

▮▮▮ Thyssen cross-appeals from the judgment entered in its favor, claiming that the judgment should be modified to hold each defendant severally liable up to the full package limitation of COGSA, 46 U.S.C.App. § 1304(5), thereby allowing Thyssen to recover its full damages. Section 1304(5) provides, inter alia, that "[n]either the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package." The district court applied the package limitation to the 104 coils unloaded in Charleston, 20 coils unloaded in Houston and 296 bundles unloaded in Jacksonville, thereby reducing Thyssen's recovery of damages from $329,330.65 to $240,845.00.[6]

In support of its contention, Thyssen argues that the disjunctive language of section 1304(5) means that the COGSA package limitation is designed to protect the carrier and vessel separately and does not limit a plaintiff's recovery *in toto* where more than one defendant is liable for the loss. We disagree. Section 1304(5) establishes that a plaintiff is entitled to a single recovery not to exceed the equivalent of $500 per package. Were we to adopt the interpretation proposed by Thyssen, plaintiffs effectively could "sidestep" COGSA's limitation of the amount of damages that a plaintiff is entitled to recover

---

**6.** This damage award also includes the 240 steel plates unloaded in Houston that were not subject to the package limitation.

when multiple defendants are subject to liability. *See Secrest Mach. Corp. v. S.S. Tiber,* 450 F.2d 285, 286–87 (5th Cir.1971) (per curiam) (rejecting request for separate package limitation recovery from each defendant as inconsistent with the bill of lading).

In this case, the damages awarded by the district court, subject to the package limitation of section 1304(5), represent the only recovery to which Thyssen is entitled. If Thyssen desired to protect its interest in the cargo beyond the package limitation amount, it ought to have contracted for that right. *See* 46 U.S.C.App. § 1304(5) ("By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed...."); *General Elec. Co. v. M.V. Nedlloyd,* 817 F.2d 1022, 1029 (2d Cir.1987) (shipper entitled to contract for higher value of cargo), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 661 (1988). Accordingly, the district court properly applied the package limitation.

### 4. Cost and Attorneys' Fees

▬ Atlantic Lines cross-appeals on the ground that it should have been indemnified by Licetus for attorneys' fees and costs it incurred in defending against the claim of the Vessel's unseaworthiness in this action. When a vessel and vessel owner breach an express warranty of seaworthiness, the charterer normally is entitled to an award of attorneys' fees. *Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhaeuser,* 507 F.2d 68, 73 (2d Cir.1974), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975); *see Peter Fabrics, Inc. v. S.S. Hermes* 765 F.2d 306, 316 (2d Cir.1985) ("Legal fees and expenses incurred in defending an indemnified claim ... fall squarely within the obligation to indemnify."). Although the district court found Licetus ultimately liable to Atlantic Lines under the terms of the Inter–Club Agreement, it failed to award or deny the requested fees.

While a remand to the district court ordinarily would be appropriate to determine the attorneys' fees question, we conclude that no fees or costs are owing to Atlantic Lines under the circumstances here. It is well established that, "while an indemnitee may recover from his indemnitor attorneys' fees and expenses incurred in defending a claim as to which he is indemnified, he may not recover fees and expenses incurred to establish his right against the indemnitor." *Id.* at 315 (collecting cases). The reason for this rule is that such expenses are not a part of defending the indemnified claim, but instead fall within the ordinary rule that each party bears its own expenses. *Id.* at 316.

Upon a review of the record, it is evident that counsel for Atlantic Lines did not defend against the plaintiffs' seawater contamination claims at trial. His opening statement clearly indicates that the only issue of concern to Atlantic Lines was indemnification and that Atlantic Lines would not be required to respond in damages no matter which side prevailed. Moreover, counsel called no witnesses and conducted only a very limited cross-examination of two of plaintiffs' witnesses. Finally, the only exhibit submitted by Atlantic Lines was the Inter–Club Agreement, which governs indemnification between Atlantic Lines and Licetus. Because Atlantic Lines' costs thus were incurred solely with respect to resolution of the indemnity issue between it and Licetus, it is not entitled to indemnification for attorneys' fees and costs.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.