**ARMADA SUPPLY, INCORPORATED, Plaintiff,**

**v.**

**S/T AGIOS NIKOLAS, her engines, boilers, etc., Lace, Limited, Black Barnett Shipping Corporation, Black Baronett Shipping Corporation, Black Count Shipping Corporation, Magelan, Inc., Magelen Maritime, Inc., Shipping and Trading International Corporation, and Anastasios Karavaias, Defendants.**

**No. 83 Civ. 603 (WCC).**

United States District Court, S.D. New York.

July 16, 1986.

Donovan Maloof Walsh & Kennedy, New York City, for plaintiff; Richard E. Repetto, Edward C. Radzik, of counsel.

Dickerson, Reilly & Mullen, New York City, for defendants S/T Agios Nikolas, Black Barnett Shipping Corp., Black Baronett Shipping Corp., Black Count Shipping Corp., Magelan, Inc., Magelen Maritime, Inc., Shipping and Trading Intern. Corp., and Anastasios Karavaias; Robert W. Mullen, of counsel.

Hill, Betts & Nash, New York City, for defendant Lace, Ltd.

**1162**

WILLIAM C. CONNER, District Judge:

This is an admiralty action brought by Armada Supply, Incorporated ("Armada"), the owner and consignee of a cargo of fuel oil shipped from Rio de Janiero to New York City aboard the S/T Agios Nikolas in late 1982. Armada sought compensatory and punitive damages from the charterers, operators, and agents of the vessel, alleging that these defendants were responsible for a shortage, contamination, and conversion of the cargo.

This matter was tried before the Court sitting without a jury, and in an Opinion and Order dated July 25, 1985, I set out my findings of fact and conclusions of law. *Armada Supply, Inc. v. S/T Agios Nikolas*, 613 F.Supp. 1459 (S.D.N.Y.1985). As I explained in that Opinion, this was no typical cargo case. Not only did defendants contaminate the cargo, but when faced with a warrant for the arrest of the vessel, they absconded with the cargo and held it for ransom. Moreover, while holding the cargo beyond the territorial reach of American authorities, defendants illegally converted some of the cargo to their own use by using it for bunkers.

In my previous Opinion, I concluded that Armada was entitled to compensatory damages in the amount of $4,130,900, and further concluded that in view of defendants' reprehensible conduct, Armada should also recover punitive damages. However, at that time I was uncertain whether the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §§ 1300–1315 (1982), which governs the rights and liabilities of the parties in this case, would permit such an award. Accordingly, I gave the parties an opportunity to brief the question of punitive damages, and I have carefully considered their submissions. For the reasons set forth below, I conclude that under the circumstances presented here, COGSA does not prohibit an award of punitive damages. Accordingly, in addition to the compensatory damages previously awarded, the Court awards Armada punitive damages in the amount of $250,000 for which all defendants not previously dismissed will be jointly and severally liable.[1]

*Discussion*

In a recent opinion, *Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57 (2d Cir.1985), the late Judge Friendly considered the extent to which courts have power to award punitive damages under general maritime law. He explained that the power to impose punitive damages in a maritime tort action was well established, but that authority to award punitive damages in a maritime breach of contract action was uncertain. Indeed, he noted that he could find no case in which an admiralty court had awarded punitive damages for a breach of contract. *Id.* at 62.

Accordingly, with the thoroughness and scholarship that typified his opinions, Judge Friendly set out to demarcate the limits of a court's power to award punitive damages for breach of a maritime contract. He concluded that, as in breach of contract actions generally, punitive damages are available for breach of a maritime contract only where the breach constitutes an independent, willful tort in addition to being a breach of contract. *Id.* at 63–64. Judge Friendly went on to hold that a "mere deviation" from a contract of carriage does not amount to a tort for which punitive damages can be imposed. *Id.* at 65.

---

1. I dismissed the action against defendant Lace, Limited at the close of plaintiff's case. I dismissed the action against defendants Magelan, Inc. and Magelen Maritime, Inc. in my Opinion and Order of July 25, 1985, subject to reinstatement upon a showing of their connection to the misconduct charged. 613 F.Supp. at 1469. Armada has attempted to show that the action against Magelan, Inc. should be reinstated on the ground that it "was just another of several corporate disguises" used by Emmanuel and Anastasios Karavaias. *See* Affidavit of Edward C. Radzik dated August 8, 1985 ¶ 5. But while there is evidence to suggest that Magelan, Inc. was an agent for the Karavaiases in connection with routine maritime matters, the evidence does not show that Magelan, Inc. had any substantial role in the extraordinary events that are the subject of this suit. Accordingly, I decline to reinstate the action against defendants Magelan, Inc. and Magelen Maritime, Inc.

In this case, Armada complains of much more than a mere deviation from the contract of carriage. As noted above, when Armada attempted to secure a warrant for the arrest of the Agios Nikolas, defendants absconded with plaintiff's cargo and held it for ransom beyond the territorial limits of the United States. In the course of doing so, defendants used the fuel oil for their own purposes by rigging an illicit pipeline between the cargo system and the bunker system and transferring the fuel oil into the vessel's bunker tanks. Thus, defendants did more than deviate from the prescribed voyage or stowage instructions; they intentionally and willfully converted plaintiff's property to their own use. Under *Thyssen*, this kind of tortious conduct is necessary and sufficient for the imposition of punitive damages under general maritime law.

However, this case is governed by COGSA, not by general maritime principles, and defendants contend that section 4(5) of COGSA, 46 U.S.C. § 1304(5) (1982), prohibits the imposition of punitive damages under any circumstances. That section permits the carrier and the shipper to agree that the carrier's liability will be greater than the limits specified by the statute, but states that "[i]n no event shall the carrier be liable for more than the amount of damage actually sustained." [2] Defendants contend that this proviso precludes all awards of non-compensatory damages.

At the outset, I note that the parties have cited and I have found only one case that addresses whether section 4(5) prohibits the imposition of punitive damages.[3] In that case, *Cosmos U.S.A., Inc. v. United States Lines*, 1983 A.M.C. 1172 (N.D.Cal. 1980), the United States District Court for the Northern District of California struck the plaintiff's demand for punitive damages in an action governed by COGSA. In articulating several grounds for its ruling, the court cited the language defendants rely on here that "[i]n no event shall the carrier be liable for more than the amount of damage actually sustained." The court stated that "courts have consistently interpreted this provision according to its apparent and literal meaning," and cited Judge Lasker's opinion in *B.F. McKernin & Co. v. United States Lines, Inc.*, 416 F.Supp. 1068 (S.D.N.Y.1976). That was the full extent of the analysis on this point.

I find *Cosmos* unpersuasive. First, I cannot agree that courts have applied section 4(5) literally. Judge Lasker's opinion in *B.F. McKernin* certainly does not stand for the proposition that section 4(5) literally precludes punitive damages in a COGSA case. Indeed, after discussing section 4(5) in the context of compensatory damages, Judge Lasker went on to consider the plaintiff's claim for punitive damages. *See* 416 F.Supp. at 1071–73. Instead of stating that the terms of section 4(5) prohibit punitive damages, Judge Lasker merely held that the facts of the case did not warrant such an award. *Id.* at 1073.

Moreover, courts in this circuit have repeatedly disregarded the literal terms of other portions of section 4(5) in awarding compensatory damages. For example, the first paragraph of section 4(5) provides in part that "[n]either the carrier nor the ship shall *in any event* be or become liable for any loss or damage to or in connection with

---

**2.** Section 4(5) reads:

Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: *Provided,* That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained....

**3.** Judge Friendly found it unnecessary to consider this question in *Thyssen.* 777 F.2d at 68.

the transportation of goods in an amount exceeding $500 per package." (emphasis added). But in *Jones v. The Flying Clipper*, 116 F.Supp. 386 (S.D.N.Y.1953), Judge Weinfeld held that notwithstanding this provision, when a carrier unjustifiably deviates from the contract of carriage it is liable for all damages resulting from the deviation and cannot invoke the $500 liability limitation. In reaching this result, Judge Weinfeld looked beyond the literal terms of the statute to the firmly entrenched rules of maritime law and the legislative history of COGSA. In *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7 (2d Cir.1969), our court of appeals approved of this approach and of Judge Weinfeld's conclusion. Thus, I think the court in *Cosmos* was mistaken to begin and end its analysis with the literal words of that portion of section 4(5) at issue here in determining whether the statute precludes an award of punitive damages.

Indeed, if one examines the legislative history of COGSA, there is no evidence that Congress intended to work a change in the law of punitive damages. COGSA was intended merely to implement the provisions of the International Convention for the Unification of Certain Rules Relating to Bills of Lading, commonly referred to as the Brussels Convention. Carriage of Goods by Sea, S.Rep. No. 742, 74th Cong., 1st Sess. 4 (1935); Uniform Ocean Bills of Lading—Hague Rules, H.R.Rep. No. 2218, 74th Cong., 2d Sess. 4 (1936). Indeed, Congress adopted in COGSA nearly all of the provisions of the Convention word for word. *Robert C. Herd & Co. v. Krawill Mach. Corp.*, 359 U.S. 297, 301, 79 S.Ct. 766, 769, 3 L.Ed.2d 820 (1959); *Encyclopaedia Britannica*, 422 F.2d at 11; Carriage of Goods by Sea, S.Rep. No. 742, 74th Cong., 1st Sess. 4 (1935).

The history of the events leading up to the adoption of the Brussels Convention has been amply rehearsed elsewhere, *see*, *e.g., Encyclopaedia Britannica*, 422 F.2d at 11; R. Temperley & J. Rowlatt, *Carriage of Goods by Sea Act, 1924* at 1–4 (3d ed. 1927), and there is no reason to repeat

it here. Suffice it to say that the signatory nations hoped to achieve a fair balancing of the interests of the carrier on the one hand, and the shipper on the other. One significant problem they sought to correct was that for years carriers had attempted to reduce their liability for shipping losses by using bills of lading that limited damages to an amount substantially less than the actual value of the cargo loss or damage. *Encyclopaedia Britannica*, 422 F.2d at 11; R. Temperley & J. Rowlatt, *supra* p. 9. Article 3, section 8 of the Convention was calculated to stop that practice. It provides that "[a]ny clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with goods arising from negligence, fault, or failure in the duties and obligations provided in this article, or lessening such liability otherwise than as provided in this convention, shall be null and void and of no effect." Congress adopted an identical provision in section 3(8) of COGSA. *See* 46 U.S.C. § 1303(8) (1982).

In exchange for this restriction on their freedom of contract, carriers won in article 4, section 5 of the Convention a 100 pounds sterling per package limitation on their liability for cargo damage. Again, Congress adopted a nearly identical provision in section 4(5) of COGSA, merely converting the 100 pounds sterling figure to $500 in American currency. *See* 46 U.S.C. § 1304(5) (1982). However, there is one principal way in which section 4(5) of COGSA differs from article 4, section 5 of the Convention. The language in COGSA that defendants rely on here, that "[i]n no event shall the carrier be liable for more than the amount of damage actually sustained," does not appear in the Convention. This provision was added by Congress.

It is clear from the legislative history that Congress's purpose in adding this language to the liability limitation provision had nothing to do with punitive damages. Instead, this language was viewed as a mere clarification of the per package liability limitation as it appeared in the Conven-

tion. *See, e.g., Uniform Ocean Bills of Lading: Hearings on S. 1152 Before the House Comm. on the Merchant Marine and Fisheries,* 74th Cong., 2d Sess. 123–24 (1936) (letter from Secretary of State Cordell Hull to Representative Schuyler O. Bland) [hereinafter cited as *"House Hearings on S. 1152"* ]. When a $500 per package liability limitation was proposed, carriers apparently feared that courts would construe it as a liquidated damages provision and that carriers would be liable for $500 whenever cargo sustained any damage, however slight. The legislative history is replete with expressions of this concern and assurances from the proponents of the statute that the per package liability limitation provision would have no such effect. *See, e.g., House Hearings on S. 1152, supra,* at 25 (1935) (statement of A.B. Barber, Manager, Transportation and Communications Dep't, Chamber of Commerce of the United States); *id.* at 67 (statement of Charles S. Haight, Chairman of the Bill of Lading Comm. of the Int'l Chamber of Commerce); *Relating to the Carriage of Goods by Sea: Hearings Before the House Comm. on the Merchant Marine and Fisheries,* 68th Cong., 2d Sess. 4 (1925) (statement of Charles S. Haight, Chairman of the Bill of Lading Comm. of the Int'l Chamber of Commerce). In this context, it is obvious that the language defendants rely on here was directed solely to the question of the perceived liquidated damages effect of the per package liability limitation.

▮ I have examined the other provisions of COGSA and I have reviewed the legislative history of COGSA generally, and I have found nothing that suggests that Congress intended to limit punitive damages. Indeed, I have found nothing that indicates that Congress ever considered the question of punitive damages.

Thus, I conclude that COGSA does not prohibit an award of extraordinary damages, and where Congress has expressed no intention to change accepted principles of general maritime law, courts should apply those accepted principles. *See Robert C. Herd & Co.,* 359 U.S. at 304–05, 79 S.Ct. at 770–71. In view of Judge Friendly's opinion in *Thyssen,* there can be little doubt that general maritime principles permit an award of punitive damages here. Accordingly, plaintiff's prayer for punitive damages is granted in the amount of $250,000.

## Conclusion

For the reasons set forth above and in my Opinion and Order of July 25, 1985, the Court will enter judgment against all defendants except Lace, Limited, Magelan, Inc., and Magelen Maritime, Inc. in the amount of $4,130,900 in compensatory damages, plus prejudgment interest calculated on the basis of the average yield of three-month Treasury bills from December 10, 1981 through the date of judgment, plus $250,000 in punitive damages. Plaintiff is directed to submit a proposed judgment on notice within seven days of the date of this Opinion and Order. The judgment may reflect each of the names by which defendant Anastasios Karavaias is alleged to be known: Anastasios Karavaias, Anastasios Karavias, and Anastasios Caravias.[4]

SO ORDERED.

---

4. Plaintiff sued Karavaias in the name of "Anastasios Karavaias" only. However, since the trial, it has come to plaintiff's attention that Karavaias may use some or all of the variations listed above, and plaintiff asks that the Court enter judgment against Karavaias in all of these names to obviate any difficulties it may encoun-

ter in enforcing the judgment. *See* Letter from Edward C. Radzik dated August 29, 1985. Karavaias has not denied that he sometimes uses these variations, and thus I see no good reason not to enter judgment against him under all of them.