LEATHER'S BEST INTERNATIONAL, INC., Plaintiff,

v.

MV "LLOYD SERGIPE" and Companhia De Navegacao Lloyd Brasileiro (C.N. Lloyd Brasileiro), Defendants.

COMPANHIA DE NAVEGACAO LLOYD BRASILEIRO (C.N. Lloyd Brasileiro), Third–Party Plaintiff,

v.

LEATHER'S BEST BRASIL COMERCIO E REPRESENTACOES LTDA., Third–Party Defendant.

No. 88 Civ. 8841 (CHT).

United States District Court, S.D. New York.

Feb. 13, 1991.

---

Bigham Englar Jones & Houston (John E. Cone, Jr., William R. Connor III, of counsel), New York City, for plaintiff.

Crowell, Rouse & Matera (Francis R. Matera, of counsel), New York City, for defendants and third-party plaintiff.

Warshaw Burstein Cohen Shlesinger & Kuh (Allen N. Ross, of counsel), New York City, for third-party defendant.

## OPINION

TENNEY, District Judge.

Plaintiff, Leather's Best International, Inc. ("LBI"), brings this action against defendant, Companhia de Navegacao Lloyd Brasileiro ("Lloyd"), for the loss of five pallets of leather which were shipped on board defendant's vessel, M.V. LLOYD SERGIPE ("LLOYD SERGIPE"). LBI alleges that the leather was stolen as a result of Lloyd's negligence and unreasonable deviations from the terms of the contract of carriage. Lloyd, as third-party plaintiff, has impleaded the shipper-consignor of the leather, Leather's Best Brasil, Comercio E Representacoes Ltda. ("LBB"), alleging that the loss was caused not by its own negligence, but rather by the acts of LBB and its agents. For the reasons set forth below, the court finds that Lloyd is liable to LBI for the full value of the missing cargo. The following, including those additional facts referred to in the Discussion, constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

1. The shipment in question consisted of 106,270.50 square feet of crust leather having a gross weight of 8,413 kilograms and a net weight of 8,233 kilograms.[1] Tr. 28, 126, 230; Exh. 27.[2]

2. The leather was acquired by LBB in Brazil and was later sold to LBI pursuant to an invoice, No. 017/88, dated February 29, 1988.[3] Tr. 28–29, 219, 230–31, 242–44; Exhs. 27, 34. LBI purchased the leather according to "cost and freight" invoice terms, meaning that LBB paid for all the transport and freight charges before the cargo was loaded on the ship. *See* Tr. 28–29, 230–31.

3. Prior to loading, LBB weighed the shipment in Novo Hamburgo, Brazil, using a scale which had been checked by Imerto, the official organization for controlling the accuracy of commercial scales in Brazil. Tr. 235–39, 420–22, 429–31, 442–43; Exh. 28, 29.

4. LBB then palletized the leather,[4] loaded it onto ten wooden pallets, and placed the pallets on a truck at LBB's warehouse in Novo Hamburgo. Tr. 422–26, 434–37.

5. The ten pallets of leather were driven by truck from LBB's warehouse to the Customs' bonded warehouse of Expresso Rio Grande Sao Paulo ("Expresso") located in the Port of Rio Grande. Tr. 511–12.

6. LBB hired a freight forwarder named Transcontinental Servicos e Representacoes, Ltda. ("Transcontinental") to oversee the movement of the cargo while it remained in Brazil. *See* Tr. 270. Transcontinental then hired Commissaria de Despachos Ltda. ("CODEL") to manage the shipment while it was at the Expresso warehouse. Tr. 270.

---

**1.** The evidence at trial indicated that the gross weight of the leather was either 8,413 or 8,431 kilograms. LBB's invoice (Pl.Exh. 27) lists the gross weight as 8,431 kilograms, whereas the "certificate of origin" issued by the import/export board of the Brazilian government (Pl.Exh. 34) and the bill of lading (Pl.Exhs. 16, 17) list the weight as 8,413 kilograms. However, this discrepancy is not material, since even if—as the defendant argues—five out of the ten pallets were stolen before it reached the port, the gross weight would have been reduced by approximately one-half.

**2.** "Tr." refers to the trial transcript. "Exh." refers to plaintiff's exhibit.

**3.** Unless otherwise indicated, all dates referred to are in 1988.

**4.** Palletizing is a process by which leather is wrapped in plastic (to make it waterproof) and burlap; the burlap is then sewn closed and plastic straps are placed around the outside of the burlap. Tr. 249.

7. On March 5, while the goods were in the Expresso warehouse, Lloyd delivered an empty container (CTIU 323389–7) to CO-DEL. Tr. 446–48.

8. Before putting the leather into the container, a Brazilian Treasury official counted the number of pallets and issued a document called a "Papeleta," attesting to the type and quantity of goods loaded into the container. Tr. 447–48, 516–17.[5]

9. The container was then closed with Brazilian Treasury seal # 852146, and the Papeleta was affixed on the outside its doors. Tr. 447–54, 516–17. The Brazilian Treasury seals that were used at the time were thin chrome-colored strips on which was written "Brazil" and "FRS" (Federal Revenue Service). Tr. 453–54.

10. The loaded and sealed container was kept in a yard toward the rear of the Expresso warehouse and remained there from March 5 to March 7. Tr. 520. The yard was controlled by the Brazilian Federal Revenue Service. Tr. 454–55.

11. On March 7, the container—with seal and Papeleta intact—was delivered to the terminal in Rio Grande operated by Consorcio de Terminals de Container do Rio Grande ("CONTECON"). Tr. 455–57.[6]

12. CONTECON issued a receipt for the container, dated March 7, indicating that the container had a gross weight of 10,885 kilograms and that it was sealed with the Brazilian Treasury seal # 852146. Tr. 455–59; Exh. 46. At the time, there were two weight scales located at the CONTECON terminal. Tr. 458–59, 493–94.

13. Transcontinental selected Lloyd as the carrier for this shipment. *See* Tr. 522. Lloyd then chose its ship, the LLOYD SERGIPE, to transport the cargo from Brazil to the United States. Exhs. 16, 17, 18. The

LLOYD SERGIPE is a general cargo ship. Tr. 110.

14. The LLOYD SERGIPE was scheduled to arrive in Rio Grande between March 5 and 7, but because of mechanical difficulties in the Port of Santos, Brazil, the ship did not arrive until March 21. Tr. 316–18, 75, 378–82.

15. The container remained at the CONTECON terminal from March 7 until March 23, when it was loaded onto the LLOYD SERGIPE. *See* Tr. 455–59, 83, 199; Exhs. 52, 57, 63.

16. The container was stowed on the ship's weather deck. Tr. 249–50, 565; Exhs. 16, 17, 18, 56. Lloyd never authorized, and none of the bills of lading contained a stamp or clause for, on-deck stowage. *Id.*[7]

17. In early 1988, there had been many reported thefts from Treasury-sealed containers located at the CONTECON terminal. Tr. 468–70, 495–99; *see* Exhs. 47, 48.

18. During the period of the ship's delay—March 7 to March 22—LBB repeatedly asked Transcontinental to have the cargo loaded into another company's container and shipped on a different vessel. Tr. 316–20. However, each request was met with Transcontinental's response that the LLOYD SERGIPE would be arriving in Rio Grande the next day, and thus, it would not be worthwhile to unload and reload the cargo into another container. Tr. 316–20, 381–84, 400–01. Transcontinental's representations were based on the information provided by Lloyd and its agents in Rio Grande. *See* Tr. 316–20, 380.

19. The LLOYD SERGIPE arrived in the port of Rio Grande on or about March 21. *See* Tr. 300–01. On March 23, the container was loaded aboard the ship, and Lloyd issued a document called a "Controle

5. An exact copy of the Papeleta was filed with the Brazilian Treasury Service, and after the theft of the leather was reported, a copy of the papeleta was filed by the Brazilian customs agency with the federal police in Rio Grande. Tr. 447–52; Pl.Exh. 64.

6. CONTECON is owned by four or five private companies, one of which is Lloyd. Tr. 456–57. In March of 1988, pursuant to a government

contract, CONTECON had exclusive control over the area of the port which exported sealed ocean-going containers. Tr. 456, 491–92.

7. The managing partner of LBB testified that no one ever asked for, and he never gave anyone permission to stow the leather on board the weather deck since the leather "can rot if it's stowed on deck and salt water can do damage." Tr. 249–50.

do Operacio," indicating that Lloyd's seal (#75501) was affixed to the container and that the container was in good condition. Exh. 52; *see* Tr. 83–84, 199.

20. Lloyd's sole agent at the Port of Rio Grande was Brascon, S.A. ("Brascon"). Tr. 56–57, 82–83, 459, 490–91. As such, Brascon was the only entity authorized by Lloyd to place its "onboard" stamps on bills of lading issued at the Port of Rio Grande.[8] Tr. 56–57, 66, 81–82.

21. Brascon issued bills of lading for the entire shipment on forms provided by Lloyd. Exhs. 16, 17, 18; Tr. 533–43, 543–44, 546. Each bill of lading specified the weight of the cargo, and each was stamped "clean on board."[9] Exhs. 16, 17, 18; Tr. 63–65, 540.

22. These bills of lading, however, possessed different "onboard" dates, ranging from March 10 to March 22. Exhs. 16, 17, 20. Twenty-nine of the thirty-one bills of lading bound for New York were stamped "clean on board" on dates prior to the arrival of the ship.[10] Exh. 20; Tr. 75–80.

23. The LLOYD SERGIPE set sail from Rio Grande on March 23. Tr. 708–09. On the way to the United States, the ship stopped at the ports of San Francisco do Sul, Vitoria, and Fortaleza. Tr. 206.

24. On April 12, the LLOYD SERGIPE arrived in Port Elizabeth, New Jersey, where the container was discharged at the Maher Terminals. *See* Tr. 612–15, 646–47.

Upon discharge, the container was not weighed and the seals were not checked.[11] Tr. 650, 651–60.

25. In order to obtain delivery of the shipment from Maher Terminals, LBI presented an endorsed original bill of lading stamped "clean on board March 10" to Lloyd's New York agent, Norton Lilly International, Inc. ("Norton Lilly"). Tr. 33, 42. The only bills of lading LBI received were those sent by LBB stamped "clean on board" March 10. Tr. 264–66, 284; Exhs. 16, 17, 18.

26. LBI then sent its trucker, S.L.A. Transport, Inc. ("S.L.A."), to deliver the container from the Maher Terminals in Port Elizabeth, New Jersey to LBI's warehouse in Johnstown, New York. Tr. 612–15.

27. When the container was picked up on April 12, it possessed the seals of both Lloyd and the Brazilian Treasury. *See* Tr. 654, 668, 687–88; Exh. 35, 53. However, the horizontal brace connected to the door hatch on the right side of the container was bent.[12] Tr. 618–20, 685–87; Exh. 53.

28. S.L.A. then transported the container to the S.L.A. yard in Gloversville, New York, where it remained overnight. Tr. 622–23. During this period, the container was kept in a secure place in the yard, making it virtually impossible for anyone to tamper with or break into the cargo. Tr. 624–25.

8. A bill of lading serves three functions: "[1] it acts as a receipt for the goods shipped, [2] it embodies the contract for the carriage of those goods, and [3] it serves as documentary evidence of title to the goods." *Internatio, Inc. v. M/V Yinka Folawiyo,* 480 F.Supp. 1245, 1251 (E.D.Pa.1979).

9. The significance of an "on board" bill of lading is to indicate that the goods represented in the bill of lading have actually been loaded on board the vessel. Tr. 61.

10. In addition, several bills of lading issued for the same voyage, but for cargo going to different ports, were stamped "clean on board" before March 21: eleven for Boston, Massachusetts, four for Philadelphia, Pennsylvania, three for Savannah, Georgia, two for Norfolk, Virginia, one for Jacksonville, Florida, and one for Baltimore, Maryland. Pl.Exhs. 21, 22, 23, 24, 25, 26.

11. Although there were weight scales on the premises, the policy of Maher Terminals is to weigh only outbound cargo, since only then is the weight an important factor in determining the stowage plan. Tr. 650, 656–60. If inbound cargo is weighed, it is usually paid for by the carrier, but in this case, Lloyd did not pay for any weighing in the Maher Terminals. *See* Tr. 656–57.

The seal numbers were not checked at the Maher Terminals because the cargo was discharged by a "straddle operation" method, during which it is too dangerous to closely examine the cargo. Tr. 651–53.

12. The door hatch is the handle onto which the seal is affixed. In order to open a container, one must remove the seal from the handle and release the hasp, thereby disengaging the locking mechanism of the doors. Tr. 686.

29. On April 13, S.L.A. delivered the container to LBI in Johnstown, New York, where LBI's warehouse supervisor signed a receipt before opening the container.[13] Tr. 625–26.

30. The thin metal seal (Brazilian Treasury seal # 852146) appeared old and "rusty looking," and the numbers on the seal were difficult to read. Tr. 591–92, 595. In order to remove the Brazilian Treasury seal, the LBI supervisor merely had to pull it with one hand.[14] *See* Tr. 592–93. A seal of this type (a metal band approximately one quarter of an inch wide) cannot normally be removed by simply pulling on its metal strip.[15] Tr. 688.

31. After the S.L.A. driver left, an LBI employee opened the container and discovered that five pallets of leather were missing. Tr. 590–95. The LBI employee also found the remaining pallets in disarray— the covers were gone, the burlap wrappings were ripped open, and there was leather lying underneath a pallet with plastic wrapping loosely resting on top of it. *See* Tr. 596–99.

32. In a letter dated April 15, LBI notified Lloyd's New York agent, Norton Lilly, that five of ten pallets of leather were missing. Exh. 30; Tr. 42.

**13.** LBI's employees customarily sign bills of lading (to evidence receipt of the container) after inspecting the seal, but before opening the container. The delivery driver is usually not allowed to let a consignee break the container's seal until after the consignee signs the bill of lading. Moreover, the driver usually leaves before the consignee opens the container to check the merchandise. Tr. 626. Although the LBI employee who signed the receipt did examine the seals, he did not look to see whether the cable wires attached to the thin rusty seal were properly crimped closed. Tr. 592–93.

**14.** Photographs were taken of the two seals and were submitted to LBB for the filing of a formal claim with the Brazilian Federal Police in Rio Grande. Tr. 310–11, 348, 403–06. Pursuant to the request of LBB's insurer, LBI gave the seals to the insurer's surveyor, Tr. 311, 691–94, but unfortunately, the surveyor lost them. Tr. 691–94.

**15.** Lloyd argues that LBI has failed to prove that the loss occurred while the container was in Lloyd's possession. In support of this argument, Lloyd cites a telex in which an LBI em-

# DISCUSSION

## A. *Jurisdiction*

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1333 (1982).

## B. *Applicable Law*

LBI contends that the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1300 *et seq.* (1982), does not govern this case because that statute applies of its own force only from the moment the goods in question are hooked to a ship's tackle for loading until the moment they are freed from the ship's tackle after discharge. Pl. Post-trial Brief at 18. According to LBI, the theft of the leather occurred prior to its being loaded onto the LLOYD SERGIPE in the CONTECON terminal, and thus, COGSA does not apply. *Id.* LBI also argues that even if COGSA does apply by virtue of its incorporation into the bill of lading, the shipper did not receive the bill until after the ship departed. *Id.* at 19.

██ Contrary to LBI's position, the bill of lading contains a "Clause Paramount" that fully incorporates COGSA and makes the statute govern two additional periods: before the goods are loaded on and after

ployee stated that "the seal number 852146 which is the seal [number] that appears on the onboard bill of lading was intact (not broken) and only broken by LBJ [Leather's Best Johnstown] upon receipt.... Customs did not break the seal because of the heavy bolt stamped LB 76501." Def. Post-trial Brief at 5–6 (citing Pl. Exh. 67 at 10). Although this telex shows that the 852146 seal may have looked undisturbed, the court is not convinced that it had not been tampered with. *See Westway Coffee Corp. v. M.V. Netuno,* 528 F.Supp. 113, 118 (S.D.N.Y. 1981), *aff'd,* 675 F.2d 30 (2d Cir.1982) (duplication of seals as possible explanation for theft of goods in container); *see also Baby Togs, Inc. v. S.S. Am. Ming, et al.,* 1975 A.M.C. 2012, 2017 (S.D.N.Y.) (evidence that padlock could have been easily picked). Obviously, since the LBI employee signed the receipt from SLA, the seals looked as though they were intact; it was not until actually opening the container, that LBI discovered that one of the seals was removable by a mere pull of the hand. *See* Tr. 625–26, 590–93.

they are discharged from the ship.[16] Pl. Exh. 16; *Brown & Root, Inc. v. M/V Peisander*, 648 F.2d 415, 420 (5th Cir.1981); *see also Croft & Scully Co. v. M/V Skulptor Vuchetich*, 664 F.2d 1277 (5th Cir.1982) (clause paramount making COGSA apply when it would not apply of its own force). The provisions of the Clause Paramount clearly indicate that the parties intended COGSA to apply to the shipment as long as the goods were in the carrier's actual custody, whether the carrier was acting as carrier or as bailee. *Saint Paul Fire & Marine Insur. Co. v. Sea-land Service, Inc.*, 745 F.Supp. 186, 189 (S.D.N.Y.1990).

Since the bill of lading contains a Clause Paramount incorporating COGSA, the court will apply COGSA to the shipment from the time LBB delivered the container to the CONTECON terminal in Brazil until after discharge when S.L.A. picked up the container from the Maher terminal in New Jersey.

## C. *Prima Facie Case*

◼ In order to establish a prima facie case, a plaintiff-consignee must show that the goods were damaged while in the defendant-carrier's custody. 46 U.S.C.App. §§ 1303, 1304 (1982); *Caemint Food, Inc. v. Lloyd Brasileiro Companhia De Navegacao*, 647 F.2d 347, 351–52 (2d Cir.1981) (citing *Pan Am. Hide Co. v. Nippon Yusen (Kabushiki), Kaisha*, 13 F.2d 871 (S.D.N.Y.1921)). The plaintiff can meet this burden by proving that (1) the cargo was delivered to the carrier in a good condition and (2) it was discharged by the carrier in a damaged condition. *Westway Coffee Corp. v. M.V. Netuno*, 675 F.2d 30, 32 (2d Cir. 1982); *M. Golodetz Export Corp. v. S/S Lake Anja*, 751 F.2d 1103, 1109 (2d Cir.), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2361, 86 L.Ed.2d 261 (1985); *Caemint Food*, 647 F.2d at 352 (citing *Vana Trading Co. v. S.S. "Mette Skou"*, 556 F.2d 100, 104 (2d

Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977)). Thus, the plaintiff is not required to prove that the defendant was at fault or explain how the damage might have occurred. *Golodetz Export*, 751 F.2d at 1109 (citing *Nissho-Iwai Co., Ltd. v. M/T Stolt Lion*, 617 F.2d 907 (2d Cir.1980)).

### 1. *Delivery to Carrier*

Lloyd argues that LBI has failed to establish a prima facie case because LBI has not proved that LBB delivered the full quantity of cargo to Lloyd. According to Lloyd, the leather was stolen while it was in the Expresso warehouse before entering the CONTECON terminal. Lloyd maintains this theory even though its own bills of lading indicate receipt of the full shipment after the cargo entered the terminal.

◼ A carrier who issues a bill of lading specifying the weight of the cargo "represents that he has no reasonable ground for suspecting that the weight of the goods actually received varies from the listed weight and that he has reasonable means of checking the weight." *Westway Coffee*, 675 F.2d at 33. Furthermore, this representation "is enough for a prima facie showing of receipt of the listed weight." *Id.*

In *Westway Coffee*, a carrier who listed the gross weights of containers of coffee on its bills of lading was estopped from denying that it received less than the specified quantity. *Id.* at 117. As a result, the plaintiff succeeded in establishing its prima facie case based only on the weights listed in the bills of lading. *Id.* The court found that because the consignee of the coffee relied on the bills of lading in paying for the shipment, the carrier was bound by the representations contained therein. *Id.* at 115. Furthermore, the fact that the seals

---

**16.** The Clause Paramount provides the following:

The contract evidenced in this bill of lading shall have effect subject to the Hague Rules ... and any legislation making those Rules compulsorily applicable to the Bill of Lading including the Carriage of Goods by Sea Act ... which ... shall be deemed incorporated herein.... The provisions cited in such Act(s) shall ... also govern before the Goods are loaded on and after they are discharged from the ship provided, however, that the Goods at said time are in the actual custody of the Carrier.

Pl.Exh. 16.

and locks on the containers remained intact did not affect the court's conclusion that plaintiff established a prima facie case. *Id.* at 117–18.

In opposing the outcome of *Westway Coffee,* defendant relies on *Roco Carriers, Ltd. v. M/V Nurnberg Express,* 1989 A.M.C. 2527 (S.D.N.Y.1989), *aff'd,* 899 F.2d 1292 (2d Cir.1990). The court in *Roco Carriers* found the defendant-carrier not liable for lost cargo, even though the carrier issued a clean bill of lading which specified the weight of the container. 1989 A.M.C. at 2530. The court came to this conclusion, however, only *after* the plaintiff had established its prima facie case. *Id.* Noting that there was no evidence of negligence on the part of the defendant, the court stated that "[t]he fact that all the seals remained intact throughout the time when the container was in [defendant's] custody indicates no fault on the part of [defendant] . . . and *rebuts the prima facie showing made by the issuance of a clean bill of lading.*" *Id.* (emphasis added). Contrary to Lloyd's argument, therefore, *Roco Carriers* supports the rule articulated in *Westway Coffee* that a bill of lading which lists the weight of the cargo establishes the first prong of a plaintiff's prima facie case—good delivery of the cargo to the carrier.

■ Here, Lloyd signed a bill of lading representing that the gross weight of the cargo was 8,413 kilograms—the weight of all ten pallets that the shipper packed into the containers at the Expresso warehouse. Exhs. 16, 17, 18, 27; Tr. 28, 126, 230. Lloyd contends that the scales at the CONTECON terminal were inoperative, thus making it impracticable to weigh the container. *See* Def.Mem. of Law at 9–10 (dated Sept. 25, 1990). However, COGSA provides a way to avoid potential liability in such circumstances: "no carrier . . . or agent of the carrier, shall be bound to state

or show in the bill of lading any . . . *weight* which he has reasonable ground for suspecting not accurately to represent the goods actually received, *or which he has had no reasonable means of checking.* 46 U.S.C.App. § 1303(3) (1982) (emphasis added); *Westway Coffee,* 528 F.Supp. at 116; *Woodhouse Drake & Carey (Trading), Inc. v. S.S. Hellenic Challenger,* 472 F.Supp. 31, 33 (S.D.N.Y.1979). Thus, if it was impracticable to check the accuracy of the weight listed by the shipper, Lloyd should not have signed the bill of lading which contained that representation. Because Lloyd did sign the bill of lading, however, LBI has sustained its burden of proving that the Lloyd received the full shipment of leather.[17] Furthermore, since Lloyd has not offered sufficient proof that it received less than that amount, LBI has established the first prong of its prima facie case.

### 2. Outturn by Carrier

■ Upon receiving delivery of a shipment, the consignee must notify the carrier of any shortage or defect in the goods; if the shortage or defect is not apparent, notice must be given within three days of delivery. 46 U.S.C.App. § 1303(6) (1982). Failure to give timely notice creates a presumption that the carrier delivered the goods in the condition specified in the bill of lading. *Sumitomo Corp. of America v. M/V Sie Kim,* 632 F.Supp. 824 (S.D.N.Y. 1985).

■ Lloyd contends that LBI's notice of deficiency was untimely because it was dated April 15—"more than five days after *discharge.*" Def.Mem. of Law at 21 (dated Sept. 25, 1990) (emphasis added). COGSA, however, explicitly requires that "[i]f the loss is *not apparent,* the notice must be given [to the carrier] within three days of *delivery* " to the consignee. 46 U.S.C.App.

---

**17.** As discussed *supra,* the district court in *Westway Coffee* held that the defendant was estopped from denying that it received less than the amount listed in the bill of lading. 528 F.Supp. at 116. The Court of Appeals, however, declined to address the issue of estoppel since the defendant provided no evidence that it re-

ceived less than the amount listed in the bill of lading. 675 F.2d at 33 n. 3. Similarly, since Lloyd did not offer evidence that it received less that the stated amount of leather, this court need not apply the estoppel principle articulated by the district court in *Westway Coffee.*

§ 1303(6) (1982) (emphasis added).[18] Here, the absence of the five pallets was not apparent from the external condition of the container, since one of the seals, although easily removable, appeared intact. Tr. 625–26, 590–93. LBI therefore had until April 16 (three days after the delivery date of April 13) to give Lloyd notice of the loss. Accordingly, plaintiff's letter of April 15 satisfied the notice requirements of COG-SA. *See* Exh. 30.

Since LBI proved that it delivered the full shipment of leather to Lloyd and that it gave Lloyd timely notice of the missing leather, LBI has established its prima facie case.

### D. *Defenses*

Once the plaintiff establishes its prima facie case, the burden shifts to the defendant-carrier to prove that the harm resulted from one of COGSA's excepted causes for which the carrier is not liable. 46 U.S. C.App. § 1304(2), (4) (1982); *Woodhouse,* 472 F.Supp. at 33.

### 1. *"Catchall" Exception*

COGSA's "catchall" exception relieves the carrier and the ship from responsibility for loss or damage that occurs without the carrier's actual fault or privity. 46 U.S.C. App. § 1304(2)(q) (1982).[19] The burden, however, is on the carrier to prove that "neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage." *Id.*

█ Here, Lloyd has failed to sustain its burden. Lloyd asserts that the theft could have occurred in the Expresso warehouse over the weekend of March 5, before the cargo was loaded onto the LLOYD SER-GIPE. However, the only evidence Lloyd submitted to support this theory was that the container remained in the yard at the rear of the warehouse. *See* Tr. 455–59, 83, 199; Exhs. 52, 57, 63. However, given the fact that the container remained at the CONTECON terminal for more than two weeks, and that there had been many occurrences of theft in the port of Rio Grande, it is more probable that the theft occurred after the container was delivered to the CONTECON terminal. Thus, without more, Lloyd's bare assertions as to when the theft could have occurred are insufficient to rebut LBI's prima facie case.

### 2. *Deviations*

COGSA also exempts a carrier from liability when cargo damage is caused by a reasonable deviation from the specified route of voyage or from the terms in the contract of carriage.[20] Here, the defendant deviated from the contract of carriage in two respects: first, by issuing of erroneous bills of lading, and second, by stowing of the cargo onboard the ship's weather deck without authorization.

#### (a) *Erroneous Bills of Lading*

█ In this circuit, a carrier is liable for the loss or damage of cargo if the carrier issued an "on-board" bill of lading erroneously representing that goods were loaded aboard its ship, regardless of whether or not that representation was fraudulent. *Berisford Metals Corp. v. S/S Salvador,* 779 F.2d 841, 846 (2d Cir.1985), *cert. denied,* 476 U.S. 1188, 106 S.Ct. 2928, 91

---

**18.** Furthermore, even if the theft occurred after discharge but before delivery—i.e., when the cargo was in the custody of S.L.A.—the duty of care still lies with the carrier. *English Elec. Valve Co., Ltd. v. M/V Hoegh Mallard,* 814 F.2d 84 (2d Cir.1987) (Harter Act, 46 U.S.C. §§ 190–96, imposes non-waivable duty of care upon carrier during post-discharge, pre-delivery period).

**19.** Section § 1304(2)(q) of COGSA provides that [n]either the carrier nor the ship shall be responsible for loss or damage arising or re-

sulting from ... [a]ny other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier....

**20.** Section 1304 of COGSA provides that

[a]ny deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom.

L.Ed.2d 556 (1986).[21] In *Berisford*, containers filled with tin ingots were stuffed, closed, locked and sealed, and transported to a storage yard controlled by the Brazilian government, where receipts were issued indicating weights equal to those listed on the shipping documents. *Berisford*, 779 F.2d at 843. After the containers were loaded aboard the vessel, the carrier issued a "clean on board" bill of lading for the specified number of ingots and their corresponding weight, even though the carrier had neither weighed nor counted the cargo. *See id.* After opening the containers at the destination port, the purchaser discovered that over half the cargo was missing even though the seals appeared intact and there had been no evidence of tampering. *Id.* In finding that the carrier had issued a false bill of lading, the court stated that

> [w]hether one likens the carrier's issuance of false bill of lading with respect to its loading of cargo to a "deviation," a "breach of warranty" or a representation which it must be "estopped" to deny, its adverse impact on trade and on reliance on bills as an essential method of facilitating trade is serious.

*Id.* at 846. The court then elaborated on the commercial significance of bills of lading:

> When the proper bill issues, the seller then ceases to assume any risk of loss or damage. The carrier, by issuing the bill, enables the seller to collect full payment of the purchase price from the buyer since presentation of an on board bill also serves to satisfy the buyer that the goods have not been stolen or lost while in the custody of the carrier prior to loading, an interval during which the seller bears the risk of any loss in any transaction requiring such a bill.

*Id.* at 847. Thus, if the accuracy of such documents were subject to doubt, "the entire structure would be weakened as a method of carrying out commercial transactions." *Id.* In holding the carrier liable,

the court emphasized that a carrier is held to a higher standard of care when it "makes a representation in a bill of lading with respect to its own conduct ... since [a carrier] is reasonably expected to be aware of *its own actions*, including whether or not it has loaded the cargo ... or has loaded the cargo below or above decks." *Id.* at 847 (emphasis in original) (citations omitted).

 In this case, Lloyd issued bills of lading which represented that the pallets of leather were "clean on board" the ship on March 10, when in fact, the ship did not even arrive at the port until March 21. *See* Tr. 300–01. Lloyd contends that LBB requested the backdating of these bills of lading for "credit requirements." Def. Post-trial Mem. of Law at 2; Def.Pretrial Mem. of Law at 8. Contrary to Lloyd's theory, however, LBI has shown that given the nature of the transaction between itself and LBB, there were no credit requirements. Specifically, the payment for this shipment was made on an open account basis by a credit on LBI's books against an existing debit, which reflected money LBI had previously advanced to LBB.[22] Tr. 29–30, 32, 49–50, 277–83, 315. The "onboard" bill of lading evidenced satisfaction of the order and acted as security for the payment. Tr. 31–32, 292–93. Thus, if LBB could not produce an "onboard" bill of lading for the shipment, LBB would have to reverse the money credited to it by LBI. Tr. 31–32; *see also* Tr. 374, 377–78. In light of this financial arrangement, it is highly unlikely that LBB would request backdated bills of lading in order to fulfill "credit requirements" for LBI.

### (b) *Stowage*

 A shipper is entitled to expect below-deck stowage under a clean bill of lading unless he has agreed otherwise, or unless above-deck stowage is customary in that particular port. *Ingersoll Mill. Mach.*

---

**21.** Given the *Berisford* court's conclusion that fraud is irrelevant to the carrier's liability for erroneous bills of lading, this court need not decide whether Lloyd's actions were fraudulent, as alleged by LBI.

**22.** This method of payment was the standard procedure used by LBB and LBI. Tr. 138–39.

*Co. v. M/V Bodena,* 829 F.2d 293, 299 (2d Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988). However, above-deck stowage is not *per se* unreasonable, and thus, the carrier has the opportunity to show that the deviation from the contract of carriage was reasonable. *Electro–Tec Corp. v. S/S Dart Atlantica,* 598 F.Supp. 929 (D.Md.1984); *see also Ingersoll,* 829 F.2d at 301 (burden is on carrier to prove "that the shipper consented to something other than the usual and customary arrangement"). Whether a stowage deviation was reasonable depends on the surrounding circumstances. If a carrier proves circumstances such as space limitations, safety and loading difficulties, or the custom and practice within an industry or between the parties, then unauthorized stowage deviations may be held as reasonable. *O'Connell Mach. Co., Inc. v. M.V. Americana,* 797 F.2d 1130 (2d Cir.1986).

■ Here, Lloyd stowed the cargo on the weather deck of the LLOYD SERGIPE without asking or receiving permission from the LBB to do so. Furthermore, given the occurrences of looting at the port of Rio Grande in early 1988, the on-deck stowage created a substantial risk of danger to the goods. *See* Tr. 249–50, 468–70; Exhs. 47, 48. Since Lloyd presented no evidence to indicate that such on-deck stowage was reasonable, the court finds that stowing the container on the ship's weather deck constituted an unreasonable deviation from the contract of carriage.

In sum, the defendant has not sustained its burden of rebutting plaintiff's prima facie case. The court concludes, therefore, that the loss of the leather was caused by the ship's delay, as well as by the carrier's unreasonable deviations from the contract of carriage in dating the bills of lading and in stowing the cargo. For these reasons, Lloyd is liable to LBI for the missing pallets of leather.

### E. *Package Limitation*

Prior to COGSA's enactment, an unreasonable deviation from the contract of carriage deprived the carrier of any limitation on liability "on the ground that such deviations ousted the contract of carriage and made the carrier fully responsible for the cargo as an insurer." *General Elec. Co. Int'l Sales Division v. S.S. Nancy Lykes,* 706 F.2d 80, 87 (2d Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). Post–COGSA cases in this Circuit have held that any unreasonable deviation will deprive the carrier of § 4(5)'s limitations on liability. *Id.* (citations omitted). The court in *General Electric, supra,* explained the rationale for this rule:

> [E]xposing carriers which engage in unreasonable deviations to the risk of full liability has the salutory effect of discouraging such deviations.... [T]o allow carriers to limit their liability when an unreasonable deviation causes damage to cargo not only would weaken the carrier's primary duty of care to cargo under [COGSA], but would render meaningless the § 4(4) distinction between reasonable and unreasonable deviations.

*Id.* (citations omitted).

■ When a carrier is found liable based on false representations in its bill of lading, it may not benefit from COGSA's package limitation on liability. *Berisford,* 779 F.2d at 846, 847 (citing 46 U.S.C.App. § 1304(5) (limiting liability to $500 per package)). The *Berisford* court stated that "the $500 per package limitation of liability may not be invoked by a carrier that has issued an on board bill of lading erroneously representing that goods were loaded aboard its ship, regardless of whether or not the carrier acted fraudulently." *Id.* at 846. Furthermore, COGSA's per package limitation on liability does not apply to a carrier where the cause of damage was an unreasonable deviation in stowage. Rather, the carrier is liable in full as insurer of the cargo. *Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d 293, 301 (2d Cir. 1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988). Accordingly, since Lloyd issued false bills of lading and unreasonably deviated in its stowage of the cargo, its liability may not be reduced by COGSA's package limitation articulated in 46 U.S.C.App. § 1304(5).

## F. *Third–Party Defendant*

■ Lloyd, as third-party plaintiff, has impleaded the shipper LBB, arguing that LBB should indemnify Lloyd for the cost of the missing cargo. In support of its claim, Lloyd relies on *Nitram, Inc. v. Cretan Life*, 599 F.2d 1359 (5th Cir.1979). The court in *Nitram* found that because a shipper is deemed to guarantee the accuracy of the information in the bill of lading, the shipper was liable to the carrier for any damages arising from inaccuracies contained therein. *Id.* at 1372–74. The carrier in *Nitram*, however, proved that the shipper delivered fewer goods than were specified in the bill of lading. *See id.; see also Oxford Shipping Co. v. New Hampshire Trading Corp.*, 697 F.2d 1 (1st Cir.1982) (carrier proved that shipper deliberately overstated weight in scheme to defraud consignee).

Lloyd has failed to show that LBB delivered less leather than was listed in the bill of lading. Furthermore, LBB proved that it did deliver to Lloyd ten pallets of leather weighing 8,413 kilograms as specified in the bill of lading. The evidence at trial clearly established that the leather was counted, weighed and sealed at LBB's premises. Tr. 420–23. Furthermore, the weight of the shipment is reflected in four different documents: LBB's packing list, the Brazilian Government's domestic shipping document ("Nota Fiscal"), the Export License, and the Certificate of Origin. Exhs. 28, 29, 32, 33, 34. The pallets of leather were loaded on a truck in the presence of an LBB employee, and transported to the Expresso warehouse in Rio Grande. Tr. 425. The shipment arrived at the warehouse intact, accompanied by the Nota Fiscal. Tr. 510. The pallets were then re-counted inside the Expresso warehouse, checking them against the Nota Fiscal. Tr. 512–514. The LBB employee and a government official witnessed the stuffing and sealing of the container. Tr. 516–18, 447–48, 451–53. Finally, when the container reached the CONTECON terminal, the officials there issued a receipt for the container, Exh. 46, which stated its weight, and did not indicate that the seals or Papeleta had been disturbed. Since Lloyd did not provide any evidence to the contrary, the court must infer that Lloyd received the shipment in full from LBB. *Tupman Thurlow Co. v. S.S. Cap Castillo*, 490 F.2d 302 (2d Cir.1974). Given LLB's proof of good delivery to the carrier, LLB is not liable to Lloyd for any part of the missing leather.

## G. *Damages*

LBI seeks compensatory and punitive damages, and both LBI and LBB have requested attorneys' fees. Pl. Post-trial Brief at 26; Third-party Def.Trial Mem. at 25; Pretrial Order at 25. For the reasons set forth below, the court grants only LBI's request for compensatory damages.

### 1. *Punitive Damages*

Nothing in the language of COGSA either prohibits or provides for punitive damages. *Armada Supply, Inc. v. S/T Agios Nikolas*, 639 F.Supp. 1161, 1165 (S.D.N.Y. 1986). Moreover, nothing in the legislative history indicates that Congress even considered the question of punitive damages. *Id.* Given this lack of legislative guidance, post-COGSA courts have applied principles of general maritime law to the issue. *Id.*

Usually, punitive damages are only awarded in admiralty cases based in tort rather than breach of contract. *Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57 (2d Cir.1985). The court in *Thyssen* concluded that liability for a stowage deviation is based on contract theory, and thus, declined to impose punitive damages against the defendant-carrier. *Id.* at 65–66. The court reasoned that the objective of deterrence is already achieved "in cases of deviation by the severe sanction of disallowing exceptions and limitations in the bill of lading, especially when this is carried to the point of making the carrier an insurer even with respect to losses have no causal relation to the deviation." *Id.*

■ Furthermore, even when the admiralty cause of action is based in tort, punitive damages are awarded only when the defendant's conduct is so morally reprehensible that it implies a criminal indifference

to civil obligations. *B.F. McKernin & Co., Inc. v. U.S. Lines, Inc.*, 416 F.Supp. 1068 (S.D.N.Y.1976) (citing *Buttignol Constr. Co. v. Allstate Ins. Co.*, 22 A.D.2d 689, 253 N.Y.S.2d 172 (2d Dept.1964), *aff'd*, 17 N.Y.2d 476, 266 N.Y.S.2d 982, 214 N.E.2d 162 (1965)). For example, one court awarded punitive damages when a carrier willfully converted the shipper's fuel oil in order to avoid an arrest warrant and to extort payment from the cargo owner. *Armada Supply, Inc. v. S/T Agios Nikolas*, 639 F.Supp. 1161, 1163 (S.D.N.Y.1986). In another case, however, the court declined to award punitive damages even if the loss had been caused by the defendant's gross disregard of the plaintiff's rights. *B.F. McKernin*, 416 F.Supp. at 1073 (defendant's misdirected shipments caused plaintiff to receive its cargo one month later than expected). The *McKernin* court stated that even if these acts were done 'with gross disregard of plaintiff's rights,' they "do not 'imply a criminal indifference to civil obligations,' and are not so 'morally culpable, or . . . activated by evil and reprehensible motives,' or 'aimed at the public generally' as to justify an award of punitive damage." *Id.* at 1073 (quoting *Buttignol*, 22 A.D.2d at 689, 253 N.Y.S.2d at 173).

▇ Here, Lloyd's liability is based on breach of contract. Even if—as LBI alleges—Lloyd also committed an intentional tort by fraudulently backdating the bills of lading, such conduct does not rise to the level of moral turpitude required for an award of punitive damages. While Lloyd's conduct in this matter was clearly unprofessional and dangerous to the negotiability of bills of lading, full liability for the lost cargo will sufficiently deter such conduct in the future. Thus, the court denies plaintiff's request for punitive damages.

### 2. *Attorneys' Fees*

Both LBI and LBB have requested an award of attorneys' fees pursuant to 28 U.S.C. § 1927 (1988) and Fed.R.Civ.Proc. 11.

▇▇ A court has the power to award attorneys' fees to a successful litigant if his opponent "has commenced or conducted an action 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2d Cir.1986) (quoting *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). However, in order to ensure that litigants are not deterred from asserting colorable claims, an award of attorneys' fees must be based on " 'clear evidence that the challenged actions are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes.'" *Id.* (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 80 (2d Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983)); *see also Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli*, 814 F.2d 115 (2d Cir.1987) (record did not support finding of clear evidence of bad faith since plaintiff's arguments were colorable). Whether a claim is colorable turns on "whether a reasonable attorney could have concluded that facts supporting the claim *might be established*, not whether such facts actually *had been established.*" *Id.* (emphasis in original) (quoting *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir.1980)).

▇ In this case, Lloyd's conduct in litigating its defenses and claims does not rise to the level that would justify an award of attorney's fees. In support of their requests, LBI and LBB rely on the fact that Lloyd did not take testimony from any of its employees or agents while all parties were in Brazil, that its only witnesses were two employees of Transcontinental, and that Transcontinental refused to have any of its files copied. Pl.Post-trial Brief at 10. While these actions are not commendable, there is no evidence that they were undertaken to harass or delay the litigation. Furthermore, even though Lloyd's claims against LBB were ultimately meritless, they were colorable insofar as a reasonable attorney could have concluded that facts supporting the claim might have been established at trial. The court therefore denies LBI's and LBB's request for attorneys' fees.

## CONCLUSION

Lloyd is liable to LBI for the five missing pallets of leather, and Lloyd's third-party complaint against LBB is dismissed. The court will determine the exact amount of damages upon the parties' submission of briefs pursuant to a schedule to be set by the court.

So ordered.